**Marie J. LOWERY, Plaintiff,**

v.

**UNIVERSITY OF HOUSTON— CLEAR LAKE, Defendant.**

**No. CIV. A. G–99–064.**

United States District Court, S.D. Texas, Galveston Division.

Feb. 8, 2000.

Sheila Beth Owsley, Houston, TX, for Marie J Lowery, PhD., plaintiff.

Jacqueline Murry Molden, Assistant Atty General, Austin, TX, for the University of Houston at Clear Lake, defendant.

### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

KENT, District Judge.

Plaintiff Lowery brings this claim against Defendant University of Houston—Clear Lake alleging age and gender discrimination in violation of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* Now before the Court is Defendant's Motion for Summary Judgment, filed December 10, 1999. For the reasons stated below, Defendant's Motion for Summary Judgment is **GRANTED.**

### I. FACTUAL SUMMARY

In September 1974, Defendant hired Plaintiff Marie J. Lowery, a white female, as an Associate Professor in Elementary Education and Language/Learning Disabilities. Two years later, Plaintiff applied for tenure and a promotion to the rank of Full Professor. She received tenure but was denied the promotion. Plaintiff applied unsuccessfully for a promotion to Full Professor again in 1977, 1978, and 1979. Although she had been repeatedly denied a promotion, Plaintiff continued her teaching responsibilities as an Associate Professor until July 20, 1998, when she tendered her resignation, effective August 20, 1998.

On July 27, 1998, Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination. She received a right-to-sue letter from the agency on November 3, 1998. Plaintiff then filed suit on February 1, 1999, alleging salary and promotion discrimination on the basis of gender and age,

in violation of both Title VII and the ADEA.

## II. ANALYSIS

### A. Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). When a motion for summary judgment is made, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Issues of material fact are "genuine" only if they require resolution by a trier of fact. *See id.* at 248, 106 S.Ct. at 2510. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. Only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. *See id.* at 247–48, 106 S.Ct. at 2510. If the evidence is such that a reasonable fact-finder could find in favor of the nonmoving party, summary judgment should not be granted. *See id.; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Dixon v. State Farm Fire & Cas. Co.,* 799 F.Supp. 691, 693 (S.D.Tex.1992) (noting that summary judgment is inappropriate if the evidence could lead to different factual findings and conclusions). Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. *See Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513.

Procedurally, the party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. at 2553; *see also* FED. R. CIV. P. 56(c). The burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial. *See Matsushita,* 475 U.S. at 585–87, 106 S.Ct. at 1355–56; *Wise v. E.I. DuPont de Nemours & Co.,* 58 F.3d 193, 195 (5th Cir.1995). The Court must accept the evidence of the nonmoving party and draw all justifiable inferences in favor of that party. *See Matsushita,* 475 U.S. at 585–87, 106 S.Ct. at 1355–56. However, to meet its burden, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts," but instead, must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 586–87, 106 S.Ct. at 1355–56 (quoting FED. R. CIV. P. 56(e)).

### B. ADEA Claims

Although the parties did not address the issue of Eleventh Amendment immunity, the Court raises it *sua sponte,* pursuant to its authority under Rule 12(h)(3) of the Federal Rules of Civil Procedure. *See Ysleta del Sur Pueblo v. Texas,* 36 F.3d 1325, 1335 (5th Cir.1994) (noting that because the Eleventh Amendment operates as a jurisdictional bar, the issue may be raised by a court *sua sponte* ); *McDonald v. Board of Miss. Levee Comm'rs,* 832 F.2d 901, 906 (5th Cir.1987) ("[E]leventh amendment immunity is a jurisdictional issue that 'cannot be ignored, for a meritorious claim to that immunity deprives the court of subject matter jurisdiction of the action.'" (quoting *Crane v. Texas,* 759 F.2d 412, 415 (5th Cir.1985))). The Eleventh Amendment prohibits actions against a state entity in federal court, unless either the state has waived its sovereign immunity or Congress, pursuant to another provision in the Constitution, has expressly abrogated the state's immunity. *See Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 237–40, 105 S.Ct. 3142, 3144–46, 87 L.Ed.2d 171 (1985). A state's intention to waive sovereign immunity must be "unequivocally expressed." *Stem v. Ahearn,* 908 F.2d 1, 4 (5th Cir.1990). Be-

cause the University of Houston—Clear Lake is an instrumentality of the State of Texas, the Court must inquire whether Plaintiff's ADEA claim is barred on the ground that Defendant enjoys Eleventh Amendment immunity. *See* TEX. EDUC. CODE ANN. § 111.73 (Vernon 1996) (signifying that the University of Houston—Clear Lake was created by the laws of the State of Texas). In this case, there is nothing to indicate that the State of Texas consented to Plaintiff's suit. More importantly, the United States Supreme Court has recently held that because the ADEA exceeds the scope of congressional authority, it is therefore invalid as an abrogation of state sovereignty. *See Kimel v. Florida Bd. of Regents,* — U.S. —, 120 S.Ct. 631, 648, 145 L.Ed.2d 522 (2000). Accordingly, Plaintiff's ADEA claims are **DISMISSED** for lack of subject matter jurisdiction.

### C. *Title VII Claims*

#### 1. *Plaintiff Properly Filed Her Suit Within Ninety Days of Receiving Her Right–to–Sue Notice*

Defendant first seeks summary judgment on Plaintiff's Title VII claims on the basis that Plaintiff did not file her lawsuit within the statutorily prescribed time period. Defendant's assertion, however, is incorrect.

Title VII provides that if the EEOC dismisses a charge brought by a person aggrieved due to unlawful employment practices or does not file a civil action within one hundred eighty days from the filing of the charge, the EEOC shall "notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge." 42 U.S.C. § 2000e–5(f)(1) (1994). The Fifth Circuit has interpreted this ninety-day limitations requirement as akin to a statute of limitations rather than as a jurisdictional prerequisite. *See Espinoza v. Missouri Pac. R. Co.,* 754 F.2d 1247, 1248 n. 1 (5th Cir.1985). It is well understood that the ninety-day limitations period begins to run "on the date the EEOC right-to-sue letter is delivered to the offices of formally designated counsel or to the claimant." *Ringgold v. National Maintenance Corp.,* 796 F.2d 769, 770 (5th Cir.1986); *accord Plant v. GMRI, Inc,* 10 F.Supp.2d 753, 755 (S.D.Tex.1998).

In this case, the EEOC issued a determination regarding Plaintiff's allegations on October 30, 1998. The central question, however, does not revolve around the date of issuance; instead, it turns on the date Plaintiff received the notice. Although Plaintiff first indicated in her interrogatory responses that she received the right-to-sue letter on October 30, 1998, Plaintiff now has provided evidence affirmatively showing that the notice was not received until November 3, 1998. *See Pl.'s Resp. to Def.'s Mot. for Summ. J Ex. 2.* Given that suit was filed on February 1, 1998 (precisely ninety days following Plaintiff's receipt of the right-to-sue letter), Plaintiff complied with the ninety-day requirement, and therefore her claims are timely. Accordingly, Defendant's Motion for Summary Judgment as to the ninety-day limitations period is **DENIED.**

#### 2. *Plaintiff's Failure to Promote Claim Is Time–Barred*

Defendant next argues that Plaintiff may not rely upon any allegation of discriminatory conduct occurring prior to September 30, 1997, because Plaintiff failed to file a charge of discrimination within three hundred days of the allegedly offensive conduct. Under Title VII, a civil action based upon employment discrimination cannot be commenced unless the plaintiff has filed a charge within three hundred days of the challenged conduct. *See* 42 U.S.C. § 2000e–5(e)(1). Generally, the limitations period begins on the date that the discriminatory act occurred, and a plaintiff cannot sustain her claims based on incidents occurring before the three hundred-day period. *See Waltman v. International Paper Co.,* 875 F.2d 468, 474 (5th Cir.1989).

In the instant case, Plaintiff filed her initial charge of discrimination with the EEOC on July 27, 1998. Hence, according to Defendant, only events occurring on or after September 30, 1997 are actionable under the statutory three hundred-day period. The Court, however, finds Plaintiff's failure to promote claim to be the only charge that is time-barred.

The Fifth Circuit recognizes an equitable exception to the three hundred-day statutory period that allows the Court to consider all relevant incidents, including those that would otherwise be time-barred, where such incidents constitute a continuing violation. *See id.* In order to sustain a claim under the continuing violation theory, the plaintiff must show that at least one incident of discrimination occurred within the three hundred-day period. *See id.* But the plaintiff must demonstrate more than a mere fact that at least one act of discrimination took place during the statutory filing period; instead, the plaintiff must also "prove a series of continuous violations constituting an organized scheme leading to a present violation." *Berry v. Board of Supervisors,* 715 F.2d 971, 981 (5th Cir.1983). To accomplish this, the plaintiff must establish that: (i) the one timely act involved the same type of discrimination; (ii) the acts and events sought to be linked in a continuing violation theory were regular or recurring; and (iii) the events had a degree or permanence that would alert a reasonably prudent person similarly situated that her rights had been violated. *See Waltman,* 875 F.2d at 475. The core idea, then, is to " 'focus [ ] on what event, in fairness and logic, should have alerted the average lay person to act to protect [her] rights.' " *Glass v. Petro–Tex Chem. Corp.,* 757 F.2d 1554, 1560–61 (5th Cir.1985) (quoting *Dumas v. Town of Mount Vernon,* 612 F.2d 974, 977 (5th Cir.1980)); *see Snooks v. University of Houston, Clear Lake,* 996 F.Supp. 686, 688–89 (S.D.Tex.1998) (declaring that "the 300–day limitations period may be equitably tolled until the time the facts supporting a cause of action are or should be apparent to the employee"

(citations omitted)). In this case, Plaintiff complains of undercompensation and failure to promote. The Court will evaluate each claim in turn.

Plaintiff first alleges that she was continually undercompensated for the ten years preceding her retirement at the University. Her claim of discriminatory undercompensation therefore extends until August 30, 1998, the date of Plaintiff's resignation. This certainly represents a time period falling well within the statutory three hundred-day period. Clearly, as to the undercompensation claim, Plaintiff meets the first two prongs of the *Waltman* test. Plaintiff further asserts that she meets the third requirement under *Waltman* because she did not realize the unlawful disparity in salaries between herself and other male colleagues until after she resigned. *See Lowery Aff.* ¶ *35.* The Court finds Plaintiff's arguments sufficient for the continuing violation theory to attach. Hence, the undercompensation claims withstand Defendant's argument for dismissal.

Plaintiff's allegations regarding the failure to promote do not, however, meet the *Waltman* requirements, because they necessarily involve only those time periods in which Plaintiff applied for a Full Professor position. Plaintiff acknowledges that the last time she attempted to obtain Full Professor status was 1979. *See* Lowery Aff. ¶ 18. It follows then that Plaintiff did not seek promotion at any time during the three hundred days preceding her filing of a charge of discrimination with the EEOC. Consequently, Plaintiff cannot show that an incident involving a failure to promote occurred within the requisite three hundred day time period—Plaintiff's failure to promote claims fails the first prong under *Waltman.* And unlike her claims regarding undercompensation, Plaintiff was aware—for more than nineteen years—that she had not received a promotion. Moreover, as an active faculty member, she knew which professors had been promoted during this time period. After eval-

uating this evidence, the Court finds that a reasonably prudent person would or should have been on notice that discrimination had occurred. *See Stewart v. Houston Lighting & Power Co.*, 998 F.Supp. 746, 749 ("A reasonable person who is rejected for a promotion for which he or she is otherwise qualified, and who also has experienced discrimination such as the Plaintiff alleges, should be put on notice of the discrimination."). Plaintiff has even cited one case that supports the Court's conclusion. *See Huckabay v. Moore*, 142 F.3d 233, 240 (5th Cir.1998) (dismissing a plaintiff's failure to promote claim as untimely because it represented "an isolated occurrence[ ] that should have put [the plaintiff] on notice that a claim had accrued"). To assert otherwise is absolutely preposterous, for Plaintiff brings forth not a single shred of evidence indicating that, for whatever reason, she had no knowledge of the unequal treatment regarding promotions and only learned of it within the three hundred days prior to filing her EEOC claim.[1] Thus, to the extent the alleged failure to promote claims occurred before September 30, 1997, they are time-barred. Accordingly, Defendant's Motion for Summary Judgment as to Plaintiff's claim of failure to promote is **GRANTED.**

### 3. Plaintiff's Undercompensation Claims Fail on the Merits

Having disposed of all but one of Plaintiff's claims, the Court now addresses on the merits the charge of compensation discrimination. Plaintiff alleges she was discriminated against because of her sex. Section 703(a)(1) of Title VII provides in relevant part: "It shall be an unlawful employment practice for an employer to ... discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1); *see Plemer v. Parsons–Gilbane*, 713 F.2d 1127, 1131–32 (5th Cir.1983) (noting that Title VII prohibits employers from paying women less than the worth of their jobs merely because they are women).

Here, Plaintiff's Title VII claim requires a showing of intentional discrimination. *See Peters v. City of Shreveport*, 818 F.2d 1148, 1153 (5th Cir.1987). To determine whether intentional discrimination exists, the Fifth Circuit applies the burden-shifting analytical framework first established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See, e.g., Johnson v. Chapel Hill Indep. Sch. Dist.*, 853 F.2d 375, 381 (5th Cir.1988) (applying *McDonnell Douglas* to a differential treatment case brought pursuant to Title VII).[2]

Under this framework, the Court employs a three-part test designed to determine a defendant's motivation in taking the challenged action. *See McDonnell Douglas*, 411 U.S. at 803–04, 93 S.Ct. at 1824–25; *Burdine*, 450 U.S. at 252–54, 101 S.Ct. at 1093–94. First, the plaintiff must establish a prima facie case by proving the elements of the discrimination claim. If the plaintiff proves her prima facie case, a presumption of discrimination arises. *See Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 957 (5th Cir.1993). The burden of production then shifts to the defendant to rebut this presumption by articulating a legitimate, nondiscriminatory reason for the alleged discriminatory action. *See Olitsky v. Spencer Gifts, Inc.*, 964 F.2d 1471,

---

**1.** The Court's finding is bolstered by Plaintiff's brief, which acknowledges that her complaint primarily focuses on alleged discriminatory acts taken against her during her latter years at the University. *See Pl.'s Resp. to Def.'s Mot. for Summ. J. at 21* ("Dr. Lowery's complaint centers on the treatment she received during the period 1990 until her retirement.").

**2.** *McDonnell Douglas* was refined in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and was further clarified in *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

1478 n. 19 (5th Cir.1992). A defendant meets this burden by proffering admissible evidence of an explanation that would be legally sufficient to justify a judgment for the defendant. *See Guthrie v. Tifco Indus.*, 941 F.2d 374, 376 (5th Cir.1991). This does not require that the defendant persuade the trier of fact that there was no intentional discrimination; the defendant need only produce evidence on that point. *See Hicks*, 509 U.S. at 507–08, 113 S.Ct. at 2747–48. Finally, once the defendant satisfies this burden, the presumption of discrimination established by the plaintiff's prima facie case dissolves. *See Burdine*, 450 U.S. at 255 n. 10, 101 S.Ct. at 1095 n. 10. The plaintiff's burden of persuasion then arises, and she must produce evidence that the defendant's proffered reasons are mere pretexts, the real reason for the action having been based on an impermissible animus. *See id.* at 256, 101 S.Ct. at 1095; *Bodenheimer*, 5 F.3d at 959. The plaintiff may succeed at this juncture, either by persuading the Court that a discriminatory reason more likely motivated the defendant, or by showing that the defendant's proffered explanation is not entitled to credence. *See Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. The ultimate burden of proving intentional discrimination rests at all times with the plaintiff. *See Hicks*, 509 U.S. at 507, 113 S.Ct. at 2749.

■ Summary judgment is particularly appropriate when the Court is evaluating evidence at the "pretext" stage of the *McDonnell Douglas* analysis. As the Fifth Circuit has noted:

> "[I]t is relatively easy both for a plaintiff to establish a prima facie case and for a defendant to articulate a legitimate, non-discriminatory reason for his decision." ... In the context of summary judgment ..., the question is not whether the plaintiff proves pretext, but rather whether the plaintiff raises a genuine issue of fact regarding pretext.

*Britt v. Grocers Supply Co.*, 978 F.2d 1441, 1450 (5th Cir.1992) (quoting *Amburgey v. Corhart Refractories Corp.*, 936 F.2d 805, 811 (5th Cir.1991)). Speculation and belief are insufficient to create a fact issue as to pretext, and pretext cannot be established by mere conclusory statements of a plaintiff who feels that she has been discriminated against. *See E.E.O.C v. Exxon Shipping Co.*, 745 F.2d 967, 976 (5th Cir. 1984); *Britt*, 978 F.2d at 1451.

### a. Plaintiff Fails to Present a Prima Facie Case of Discriminatory Compensation

■ In this case, Plaintiff alleges that because of her sex she was compensated differently than her male counterparts at the University. To establish a prima facie case of compensation discrimination under Title VII, a plaintiff must demonstrate that (1) she is a member of a protected class, and (2) she was paid less than a nonmember for work requiring substantially the same responsibility. *See Uviedo v. Steves Sash & Door Co.*, 738 F.2d 1425, 1431 (5th Cir.1984); *see Pittman v. Hattiesburg Mun. Separate Sch. Dist.*, 644 F.2d 1071 (5th Cir.1981). Defendant does not deny that Plaintiff is a member of a protected class; instead, Defendant contends that it paid her more than at least one of the men to whom she compares herself. Defendant also argues that comparing Plaintiff's salary to the other male faculty member listed in Plaintiff's complaint is inappropriate because he is a Full Professor, while Plaintiff was at all times an Associate Professor.

■ For the purposes of her pay discrimination claims, Plaintiff compares herself to Randy Seevers, an Associate Professor, and John Carter, a Full Professor. *See Pl.'s Compl.* ¶ *10–11.* At the outset, the Court notes that Plaintiff cannot use Carter as a proper basis for comparison because as a Full Professor Carter does not share comparable duties and responsibilities with Associate Professors. Moreover, because of seniority and status, Full Professors are compensated at an entirely different rate than are Associate Professors such as Plaintiff. Simply put, evaluating the salary package received by a Full

Professor vis-a-vis an Associate Professor reveals nothing that the Court could possibly find relevant in so far as it applies to the undercompensation claims posed by Plaintiff. Therefore, the Court will focus on Plaintiff's comparison to Seevers.

In the brief, overlapping period in which they both worked at the University, Plaintiff never received a lower salary than Seevers. In fact, Dr. Dennis Spuck, Dean of the Education Department (the individual responsible for determining salary decisions) has provided a sworn statement explaining that Dr. Seevers began teaching at the University of Houston—Clear Lake campus as a professor in the fall semester of 1998 at an annual starting salary of $38,001.00. *See Spuck Aff. ¶ 13.* When Plaintiff retired in August 1998, she received a salary of $43,409.00. As to Seevers, Plaintiff has therefore failed to prove she "was paid less than a nonmember for work requiring substantially the same responsibility."

### b. Defendant Offers Legitimate Non-discriminatory Reasons for the Alleged Discriminatory Actions

 Assuming arguendo that Plaintiff could meet the two-pronged *Uviedo* test, the Court now considers Defendant's proffered reasons for its actions. In determining merit pay increases, Defendant has instituted a clearly defined procedure. All full-time continuing faculty members undergo an annual review, which involves a multi-step process. Faculty members first complete an annual review form in which they self-report their activities, accomplishments, and rate their overall performance in the areas of teaching, scholarship, and service. Once the self-report forms are completed, the Associate Dean at the School of Education then independently rates each faculty member's performance in the areas of teaching, service, and research, and provides written comments explaining the basis for the ratings.[3] The forms are then returned to each faculty member for signature, whereupon the ratings are forwarded to the Dean of the School of Education for final approval.[4] The ratings approved by the Dean form the basis for determining merit salary increases. Using these ratings, faculty members are divided into four levels of merit, with each level being assigned a specific monetary amount drawn from the fiscal year's budget. The levels form a sliding scale: faculty members assigned to the fourth level receive the most merit money, while those placed in the first level receives the least. *See Spuck Aff.* ¶¶ 5–7.

Plaintiff does not dispute that her ratings over the past decade have consistently been less than stellar. In January 1988, Dr. Spuck, then Associate Dean, rated Dr. Lowery as "Very Good" in teaching, "Poor" in research, and "Fair" in service—all of which served to rank her in the first (lowest) level of merit. *See Def.'s Mot. for Summ. J. Ex. 5 Attach. 6.* The next year, Associate Dean Spuck rated Dr. Lowery as "Very Good" in teaching, "Poor" in research, and "Very Good" in service—all of which served to rank her this time in the second level of merit. *See id. Ex. 5 Attach. 7.* In January 1990, Associate Dean Spuck ranked Dr. Lowery as "Outstanding" in teaching, "Very Good" in service, but Dr. Lowery did not receive a rating for research because she allegedly failed to demonstrate research activities (which in-

---

**3.** For each area reviewed, the Associate Dean assigns a rank of "Outstanding," "Very Good," "Good," "Fair," or "Poor." If a faculty member fails to submit the annual review evaluation, the Associate Dean may also list "No Teaching," "No Service," or "No research."

**4.** Upon receiving the evaluation completed by the Associate Dean, a faculty member may submit a written request for reconsideration of the ratings. The Associate Dean is then required to notify the faculty member in writing of the results of the reconsideration. *See* Spuck Aff. ¶ 5. Dean Spuck's affidavit states that during the time in which he served as Associate Dean, Plaintiff "never appealed any of the review ratings I rendered." *Id.* What is more, when Dr. Spuck became dean, he "never changed any of the ratings and/or rankings the Associate Deans awarded to Dr. Lowery." *Id.* ¶ 6.

clude publications, research grants or awards, or presentations)—all of which caused her once again to rank in the second level of merit. *See id.* Ex. 5 Attach. 8; Spuck Aff. ¶ 9. Dr. Spuck attributes Plaintiff's low ranking on the merit scale to her "poor" research scores. And although Plaintiff had the right to challenge these ratings and have them reconsidered, Plaintiff did not chose not to pursue such action, and instead signed each evaluation sheet for submission to the Dean. *See* Spuck Aff. ¶ 5.

Plaintiff's deficiencies in scholarship and research were also noted by the other Associate Deans who evaluated her performance. In 1991, Associate Dean Thomas C. Gee awarded Plaintiff an "Outstanding" rating in teaching, a "Fair" rating in research, and a "Very Good" rating in service—which resulted in Plaintiff ranking in the third level of merit. *See Def.'s Mot. for Summ. J.* Ex. 5 Attach. 9. The next year and in 1996, Plaintiff failed to submit an Annual Review report to the Associate Dean responsible for her evaluations; accordingly, she was not awarded a merit increase during those years. *See* Doris Pather Aff. ¶ 8; Hans Olsen Aff. ¶ 7; *Def.'s Mot. for Summ. J.* Ex. 6 Attach. 4 (informing Plaintiff that Dr. Doris Pather (female) had not received her Annual Review and warning that Plaintiff would be assigned the lowest level of merit for the year if the Annual Review was not submitted); *id.* Ex. 7 Attach. 1 (informing Plaintiff that because Plaintiff had not submitted her Annual Review form, Dr. Olsen could not offer a merit recommendation "except as to no credit and no merit"). In the remaining years, from 1992 until 1997 Plaintiff continued to typically receive a "Poor" ranking in the area of research, and a "Fair" rating in the area of service—thus, she ranked in the first (lowest) level of merit every year other than 1994, when she ranked in the second level. *See Def.'s*

*Mot. for Summ. J.* Ex. 6 Attach. 1–3; *id.* Ex. 7 Attach. 2–3.

Plaintiff's poor ranking in research each of the past ten years explains why she, as a university academician, did not receive higher overall scores in the merit salary rankings. The salary disparity complained of by Plaintiff can therefore easily be explained by factors other than gender. *See Travis v. Board of Regents,* 122 F.3d 259 (5th Cir.1997), *cert. denied,* 522 U.S. 1148, 118 S.Ct. 1166, 140 L.Ed.2d 176 (1998). Ultimately, Defendant's explanation for its salary decisions qualifies as a legitimate, nondiscriminatory reason for Plaintiff's allegedly low compensation. Thus, the Court finds, as a matter of law, that Defendant's evidence that Plaintiff's evaluations and publication rate constitute legitimate, nondiscriminatory reasons for any possible disparity in pay between Plaintiff's original salary as Associate Professor in 1974 and Dr. Seevers's initial salary as Associate Professor in 1998. Having found these legitimate, nondiscriminatory reasons, the burden-shifting structure of *McDonnell Douglas* becomes irrelevant to Plaintiff's claims, and the inference of unlawful discrimination—had it been created by Plaintiff's prima facie evidence—disappears. *See Burdine,* 450 U.S. at 255 n. 10, 101 S.Ct. at 1095.

> c. *Plaintiff Fails to Show Evidence of Pretext Necessary to Overcome Defendant's Nondiscriminatory Justifications*

Finding that Defendant has indeed offered a legitimate nondiscriminatory explanation for Plaintiff's compensation, the Court now turns to the issue of pretext.[5] A plaintiff alleging employment discrimination need not come forward with direct evidence of discriminatory intent in order to avoid summary judgment. *See La Pierre,* 86 F.3d at 449; *Rhodes v. Guiber-*

---

**5.** As noted previously, it is because the Court wishes to proceed with extreme caution in this case that it continues this exercise, despite the fact that the Court has already found

that Plaintiff has failed to present a prima facie case of discriminatory undercompensation.

*son Oil Tools,* 75 F.3d 989, 994 (5th Cir. 1996) (en banc). Such direct evidence of an employer's discriminatory intent is rare; therefore, Title VII plaintiffs ordinarily must prove their claims through circumstantial evidence. A plaintiff establishes this circumstantial evidence of intentional discrimination by demonstrating that Defendant's articulated nondiscriminatory rationale is pretextual. *See McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825; *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. Indeed, "[t]he factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination." *Hicks,* 509 U.S. at 511, 113 S.Ct. at 2749.

██ Although the burden here rests with Plaintiff, she fails to persuade the Court that a rational jury could find a discriminatory reason motivated Defendant or that Defendant's proffered reasons are unworthy of credence. *See Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. Plaintiff offers the following evidence of discrimination: (1) the affidavits of Dr. Henry Williams, Dr. John Carter, and Dr. Betty Criscoe, (2) a battery of graphs allegedly charting salary comparisons in the University's Education Department, and (3) her own affidavit.

Neither Dr. Williams's nor Dr. Carter's affidavits support a reasonable inference of gender-based salary discrimination directed toward Plaintiff.[6] At most, the affidavits merely establish that Dr. Spuck closely managed faculty committee assignments, and that based on unconfirmed figures, a younger faculty member, Dr. Rakow, received higher merit increases than Plaintiff—a fact that both Drs. Williams and Carter attribute to Dr. Spuck's supposed favoritism of Dr. Rakow over Plaintiff.[7] These assertions simply do not prove an animus based on gender. For her part, Dr. Criscoe's affidavit discusses the reason she left the University in 1994 and opines that Dr. Spuck intentionally set out to ensure that she received a lower salary. This affidavit, however, does not discuss the Plaintiff's situation and offers no verifiable proof that Defendant intentionally discriminated against Plaintiff by improperly undercompensating her—particularly given the low scores Plaintiff consistently received in her annual reviews.

Next, Plaintiff has provided the Court with twenty-eight home-spun graphs allegedly depicting (1) a long-standing salary disparity that has existed between men and women in the Education Department at the University, and (2) the specific salary differentials between each male professor in the Department and Plaintiff. Although Plaintiff claims that these graphs "verify the extreme discrepancy between Dr. Lowery and her peers," they, in their current form, prove nothing of the sort. *Pl.'s Resp. to Def.'s Mot. for Summ. J. at*

6. The fact of the matter is that the highest paid Associate Professor and Full Professor in the Department of Education are both women. *See* Spuck Aff. ¶ 12.

7. Plaintiff has presented absolutely nothing to support this unsubstantiated claim. In fact, the evidence indicates otherwise. Since 1994, Dr. Rakow has consistently received high ratings in his annual reviews and therefore has ranked in the fourth (highest) level for merit increases. *See Def.'s Mot. for Summ. J. Ex. 8 Attach. 4–9.* Interestingly, in 1994 Dr. Rakow applied for Full Professor status, but was denied. In his evaluation, Dr. Rakow received a "satisfactory" rating in research because, according to Dr. Edward J. Hayes, Senior Vice President for Academic Affairs and Provost, his "research [showed] relatively small growth since 1990 when [he] became associate professor." *See id.* Attach. 1. Dr. Rakow "made a concentrated effort to improve [his] performance in the area of research," *see* Rakow Aff. ¶ 4; *Def.'s Mot. for Summ. J. Ex. 8 Attach. 2,* and subsequently improved his ratings in that category. Comparing the progress Dr. Rakow made in his research endeavors to that undertaken by Plaintiff during the same time period reveals a stark discrepancy. For Drs. Williams and Carter to suggest that Dr. Rakow's record does not support the merit increases he received overlooks Dr. Rakow's demonstrated efforts to improve upon his research skills and publication rate.

*13.* None of the graphs have been authenticated, and therefore they are not verifiable. These exhibits do not indicate who researched, complied, or computerized the graphs, nor do they reveal the basis for the calculations. *See id.* Ex. 28–36.[8] The Court cannot even adduce from many of the graphs which professors are male and which are female. The composition of these exhibits makes them virtually undecipherable. Because the Court has no way to corroborate the underlying data upon which the graphs are based, it is inadmissible in its present form.[9]

■ The only other evidence produced is Plaintiff's own affidavit stating, among other things, that "Dean Spuck ... ignored the policies and procedures of both the University and the School of Education," that the Associate Deans "conveniently lost" two of Plaintiff's annual reviews, that Dean Spuck manipulated faculty committee assignments so as to reduce Plaintiff's participation in service activities, and that Dean Spuck arbitrarily canceled one of her teaching programs. *See* Lowery Aff. ¶¶ 18–21.[10] The Court initially notes that Plaintiff adduces no proof whatever of her qualifications to receive greater merit pay increases than she actually received. Defendant has stressed that Plaintiff's poor showing in academic scholarship goes a long way toward explaining her low merit salary increases. And, even Plaintiff acknowledges that she did not devote as much effort to her research endeavors as her colleagues. *See* Lowery Aff. ¶ 30 (noting that Plaintiff voluntarily chose to focus on service rather than research and agreeing that "[o]ur goal should be to acquire, disseminate and preserve knowledge, rather than teach, research and service.").[11] Such an admission supports Defendant's position that sex has nothing to do with this employment dispute. Plaintiff's lower pay is explained by poor performance, particularly in the area of scholarship.

8. In fact, Plaintiff's Exhibits 29 and 30 do not even include a label along the X-axis indicating the years covered by the graphs. In any event, none of the graphs have accompanying spreadsheets detailing either the actual data figures that were plotted onto each graph or where these figures come from.

9. Assuming, however, that the graphs accurately reflect the salary figures earned in the University's Department of Education, they, by themselves, still do not prove that Plaintiff's alleged undercompensation was motivated by unlawful sexual discrimination. Instead, if accurate, the graphs regarding salary differences would reflect that Plaintiff's annual review scores have been lower than those earned by her academic peers. *Compare, e.g., Def.'s Mot. for Summ. J. Ex. 10* (revealing the ratings that Associate Professors Drs. Robert M. Jones, Fred D. Kierstead, Steven Rakow, and Paul A. Wagner received in their annual reviews), *with Def.'s Mot. for Summ. J. Ex. 5* (revealing relatively lower ratings in Plaintiff's annual reviews). Accordingly, even with these crude graphs, Plaintiff cannot create an inference that any pay disparity was the result of intentional discrimination based on gender.

10. In her affidavit, Plaintiff also recounts a single gender-based comment made during her employment at the University. She states that Dr. Spuck told another faculty member "We don't have to worry about that old white-haired lady." Lowery Aff. ¶ 25. A single comment told by a supervisor does not support a claim of discrimination by itself, nor does it reveal Defendant's reasons for not increasing Plaintiff's merit pay. *Cf., e.g., Boyd v. State Farm Ins. Companies,* 158 F.3d 326, 329 (5th Cir.1998) (noting that absent a causal link between the remark and the employment decision, a supervisor's single racial comment is only a "stray remark from which no reasonable fact-finder could infer race discrimination. The mere utterance of a racial epithet is not indicia of discrimination under Title VII."), *cert. denied,* —— U.S. ——, 119 S.Ct. 1357, 143 L.Ed.2d 518 (1999).

11. Plaintiff also raises questions regarding how the University incorporated her "research" into her annual evaluations. Plaintiff alleges that time and again her work was "totally ignored and [was] never counted toward my evaluation." *See* Lowery Aff. ¶ 32. Plaintiff, however, provides no proof either that she had in fact included these "uncounted" research activities in her evaluation, or that the administration omitted them from consideration during the evaluation process. More importantly, despite the fact that all professors are given the opportunity to challenge, in writing, evaluations with both the Associate Dean and the Dean, Plaintiff has offered no evidence that she ever did so.

See *EEOC v. Louisiana Office of Community Servs.*, 47 F.3d 1438, 1447 (5th Cir.1995) (noting that "unless disparities in curricula vitae are so apparent as virtually to jump off the page and slap us in the face, we judges would be reluctant to substitute our views for those of the individuals charged with the evaluation by virtue of their own years of experience and expertise in the field in question").

Thus, other than her personal beliefs, Plaintiff has no admissible evidence to support her assertions that she was treated unfairly due to her sex.[12] As the Court has stated previously, "[s]peculation and belief are insufficient to create a fact issue as to pretext." *McKey v. Occidental Chem. Corp.*, 956 F.Supp. 1313, 1319 (S.D.Tex.1997). Moreover, conclusory allegations of intentional discrimination simply do not suffice. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir.1996) (en banc) ("In short, conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden.... It is more than well-settled that an employee's subjective belief that he suffered an adverse employment action as a result of discrimination, without more, is not enough to survive a summary judgment motion, in the face of proof showing an adequate nondiscriminatory reason."); *see also Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 42 (5th Cir.1996) (noting that plaintiff's generalized statements regarding relative qualifications or the treatment of similarly situated employees is insufficient to support an inference of discrimination); *Ray v. Tandem Computers, Inc.*, 63 F.3d 429, 434 (5th Cir.1995) (stating that "bald assertions of age discrimination are inadequate to permit a finding that proscribed discrimination motivated [the defendant's] actions against [the plaintiff]"). In the end, Plaintiff has not succeeded in persuading the Court that a rational jury could be persuaded that a discriminatory reason more likely motivated Defendant, nor has she shown that Defendant's proffered explanation is not entitled to credence. *See Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. Consequently, Defendant's Motion for Summary Judgment on Plaintiff's discrimination claims regarding undercompensation is **GRANTED,** and those claims are hereby **DISMISSED WITH PREJUDICE.**

## III. CONCLUSION

After an exhaustive review of this case, Plaintiff's ADEA claim is **DISMISSED WITH PREJUDICE,** pursuant to the Supreme Court's recent holding in *Kimel v. Florida Board of Regents.* Moreover, Plaintiff's Title VII claim surrounding the failure to promote is **DISMISSED WITH PREJUDICE** due to limitations problems. Finally, because Plaintiff has failed either to prove a prima facie case of discrimination or to adequately rebut Defendant's evidence that she had not met the criteria for merit pay increases, Plaintiff's Title

---

12. Plaintiff clings to the idea that Defendant's evaluation system memorialized in its annual review process is subjective and a pretext for discriminatory merit pay increases. In short, Plaintiff believes that her consistently low rankings reveal Defendant's discriminatory motive. The Court, however, fails to see how written evaluations completed by three different individuals (one of whom was a female) evidences a discriminatory motive—particularly when Plaintiff had the opportunity to formally challenge any determinations made by these officials, but chose not to do so. Plaintiff has supplied the Court with no evidence showing that she asked for reconsideration of her evaluations or of the methodologies employed to reach her individual rankings. Hence, Plaintiff does not provide sufficient evidence to support her allegation that the evaluation system was subjective and sexually discriminatory.

In the end, Plaintiff's seeks for this Court to revise the University's system for evaluating its professors, because Plaintiff is upset that the Dean and Associate Deans retained the exclusive authority to determine merit pay increases according to a ranking system that measures scholarship, service, and teaching. The Court declines to undertake the responsibility of second-guessing Defendant's business decisions, which necessarily include methods for evaluating employee performance. *See, e.g., Walton v. Bisco Indus., Inc.*, 119 F.3d 368, 372 (5th Cir.1997).

VII claim involving undercompensation is also **DISMISSED WITH PREJUDICE.**

The parties are **ORDERED** to file no further pleadings on these issues in this Court, including motions to reconsider and the like, unless justified by a compelling showing of new evidence not available at the time of the instant submissions. Instead, the parties are instructed to seek any further relief to which they feel themselves entitled in the United States Court of Appeals for the Fifth Circuit, as may be appropriate in due course.

**IT IS SO ORDERED.**

### *FINAL JUDGMENT*

For the reasons set forth in the Order issued this date, each of Plaintiffs' claims is **DISMISSED WITH PREJUDICE.** All parties are **ORDERED** to bear their own costs and attorney's fees incurred herein to date.

**THIS IS A FINAL JUDGMENT.**

**IT IS SO ORDERED.**