Paulette W. YOWMAN, Plaintiff,

v.

JEFFERSON COUNTY COMMUNITY SUPERVISION & CORRECTIONS DEPARTMENT, Defendant.

No. 1:03–CV–543.

United States District Court, E.D. Texas, Beaumont Division.

Jan. 28, 2005.

Motion to Dismiss (# 20) and Motion for Summary Judgment (# 25). JCCSCD seeks dismissal of Plaintiff Paulette W. Yowman's ("Yowman") complaint for failure to state a claim upon which relief may be granted, alleging, among other claims, that her amended complaint, adding JCCSCD as a defendant, was untimely and did not relate back to the original complaint. In addition, JCCSCD seeks summary judgment on Yowman's claims for race, gender, and age discrimination under the Civil Rights Act of 1866, 42 U.S.C. § 1981, the Civil Rights Act of 1991, 42 U.S.C. § 1981a, the Age Discrimination in Employment Act of 1967 ("ADEA"), as amended, 29 U.S.C. §§ 621–634, and Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e–2000h–6. Having reviewed the pending motions, the submissions of the parties, the pleadings, and the applicable law, the court is of the opinion that dismissal based on untimeliness is unwarranted, while summary judgment with respect to Yowman's claims of employment discrimination should be granted.

Otto D. Hewitt, III, Hewitt Law Firm, Alvin, Richard Glenn Lewis, Law Office of Norman A. Desmarais, Jr., Port Arthur, TX, for Plaintiffs.

Larry James Simmons, Jr., Pamela D. Williams, Germer, Bernsen & Gertz, Beaumont, TX, Susan Elizabeth Werner, Attorney General's Office, Austin, TX, for Defendants Jefferson County, TX, Jefferson County Community Supervision & Corrections Dept.

## MEMORANDUM AND ORDER

CRONE, District Judge.

Pending before the court is Defendant Jefferson County Community Supervision & Corrections Department's ("JCCSCD")

I. *Background*

Yowman, a resident of Jefferson County, Texas, is an African–American female, fifty-six years of age, who was employed as a probation officer with JCCSCD. JCCSCD is a governmental entity that provides for the monitoring of criminal defendants who have been sentenced by state district courts and county courts at law. JCCSCD was established, according to Texas law, by the state district court judges trying criminal cases in Jefferson County, Texas, and maintains offices in Beaumont, Port Arthur, and Mid–County. *See* TEX. GOV'T CODE ANN. § 76.002 (Vernon 2004). According to JCCSCD, over 100 individuals work in its three offices, supervising approximately 6,000 probationers.

The record reflects that Yowman was hired as a probation officer on November 1, 1979, and on May 6, 2003, after nearly twenty-four years of service with JCCSCD, she was terminated. When first employed, Yowman was assigned to the Port Arthur office, where she worked under Jim Stott ("Stott"), the Unit Supervisor, for approximately one year until he was transferred to the Beaumont office. According to Stott, Yowman "received good evaluations for the majority of her tenure, including the time she worked as a probation officer in my unit." In 1984, Stott was promoted to Deputy Director of JCCSCD. As Deputy Director, Stott approved each of Yowman's raises and allocated money in the budget to fund her promotion to Assistant Supervisor.

Throughout the years, however, Stott repeatedly received "complaints concerning [Yowman's] work performance and attendance." In 1986, Monti Morgan ("Morgan"), the Director of JCCSCD, conferred with Yowman and her supervisor, Allan Thomas ("Thomas"), about her job performance. Morgan explained that "[t]hough [Yowman] received good evaluations, in 1986, I had resolved a dispute between the two wherein Mr. Thomas had alleged insubordination on her part." After an investigation, Morgan cautioned Yowman "that her defiant behavior toward a supervisor was unacceptable."

In August 2000, due to insufficient funds, JCCSCD ended its Boot Camp program, which resulted in a reassignment and relocation of several employees. During this transition, Morgan reportedly received reports from staff complaining of Yowman's performance and inaccessibility. According to Morgan, Yowman's cases were not in compliance with agency standards, misdemeanor mail-in cases were not monitored properly, and several cases were not consistent with the original court orders. Due to her continued perform-

ance problems, Yowman was transferred to the Beaumont office in August 2000 and placed under the supervision of Jan Watts ("Watts"). Morgan elaborated that Yowman was reluctant to transfer despite the fact that she had previously applied for two supervisory positions in Beaumont, one of which was given to Watts, a white female, and the other to Elouise Brannon, a black female in her fifties.

At the Beaumont office, Yowman's duties "related to processing the cases for transfer, completing all the required paperwork, photocopying the required documents, and sending the transfer requests to the receiving jurisdiction and through interstate compact for out of state transfer cases." Watts stated in her affidavit that "[a]fter I became supervisor, I noticed that [Yowman] was absent from the office without notifying me of her whereabouts." Watts confronted Yowman about the absences and informed her that she needed to consult Watts before taking leave and to notify the staff and Watts of her whereabouts if she left during office hours.

In Fall 2001, JCCSCD was preparing for an audit by the Community Justice Assistance Division ("CJAD") of the Texas Department of Criminal Justice ("TDCJ"). Through the CJAD, TDCJ distributes funds for the operation of local community supervision and corrections departments. According to Morgan, "TDCJ promulgates rules and standards for delivery of probation services and audits to see that [community supervision and corrections departments] are using the money in accordance with standards and expectations." In preparation for this audit, Watts asked Yowman if her cases were in compliance with agency standards. Yowman indicated that they were and that she did not need assistance preparing for the audit. In October 2001, Watts reviewed some of Yowman's files and found that "cases lacked

documentation and the transfer work had not been completed so some of the probationers were unsupervised." On October 19, 2001, Morgan met with Watts and Yowman and instructed Yowman to bring her cases into compliance. In addition, Morgan issued a letter of reprimand to Yowman on October 22, 2001, advising her that her cases needed to be in compliance by November 30, 2001, or she would be subject to discipline, including termination.

From December 2001 through January 2002, Morgan, Stott, and Watts conducted their own audit of Yowman's cases. Although Morgan did not complete his portion of the audit, Stott and Watts found Yowman's cases to be non-compliant and "poorly documented, if documented at all." According to Stott, "[s]pecifically, I found many of the cases on her docket which were not documented correctly and others retained on her docket which should have been closed." In July 2002, Watts and Morgan met with Yowman. During the meeting, Yowman complained that Watts was not doing her job and called Watts a liar. The meeting concluded with Morgan instructing Yowman to follow the directions of Watts, her supervisor.

In Spring 2003, Watts reported to her supervisors, Stott and Morgan, that Yowman "continued not to tell me of her whereabouts and absences and did not follow-up on my requests to see that her cases were in compliance with CJAD standards." In April 2003, an incident occurred in which a "transfer-out" probationer waited more than one hour to see Yowman to complete the transfer paperwork. One of the clerical staff informed Watts that Yowman had left over an hour previously to have her car repaired. Watts completed the intake and confronted Yowman about her absence, reminding her to seek permission if she was going to leave during office hours. On May 5, 2003, while looking for Yowman at around 12:00 p.m., Watts was informed that she had gone to the jail to visit a probationer and had signed out at 10:20 a.m. Watts discovered that the probationer had not been in jail since March 2003. In order to verify Yowman's time at the jail, Watts contacted two other individuals who had signed in before and after Yowman at the jail and who had completed their work in a timely manner. Yowman did not return until 12:45 p.m. When Watts inquired as to why it had taken her so long to visit one probationer, who was not even in jail, Yowman became hostile and refused to explain. According to Watts, a frequent visitor at the jail, an interview of a probationer, especially one not in custody, "should take about 45 minutes."

In the same month, Yowman complained about Watts to Stott. Stott and Yowman discussed her use of leave without notice and the possibility of a transfer. Stott was reluctant to transfer Yowman due to the "difficulties she had with personnel in the Port Arthur office and now in Beaumont." Stott was convinced that if Yowman were to transfer, the same problems would arise again. In Stott's opinion, "[Yowman] would not take instruction from her supervisors, particularly in relation to leave and notification of her whereabouts during work hours."

In May 2003, Watts reported to Morgan that Yowman was "once again refusing to accept my supervision of her" and recommended her termination. On May 6, 2003, a meeting was held between Morgan, Stott, and Yowman to discuss both the car repair and jail incidents. Morgan stated in his affidavit that, when asked about the first episode, in which the probationer waited for Yowman for over an hour, Yowman responded that the probationer did not wait that long. When questioned about the second incident at the jail, despite the fact that Watts had provided

information that other individuals had completed their work in a timely manner the same day, Yowman responded that she "listened to the radio in her car, took the wrong file, stopped for gas, and picked-up lunch." Morgan deemed her explanations to be insufficient and her performance to be unacceptable. Accordingly, he notified Yowman that "due to her long tenure she could retire and retain her benefits or I would terminate her." On May 6, 2003, Yowman retired and was replaced by Tiffany Nichols, a white female probation officer.

After her retirement, on May 9, 2003, Yowman filed an employment discrimination charge with the Equal Employment Opportunity Commission ("EEOC") and the Texas Commission on Human Rights ("TCHR") alleging that she had been terminated because of her race, gender, and age in violation of 42 U.S.C. §§ 1981 and 1981a, the ADEA, and Title VII. Yowman indicated in her EEOC and TCHR charge that the discrimination took place when she was discharged on May 6, 2003. Though not alleged in her complaint or the EEOC and TCHR charge, Yowman testified at deposition that she was treated more harshly than four probationary officers: Donna Bucherie, Lonnie Nichols, Tiffany Nichols, and Belinda Catalina. After being unable to substantiate her charge of discrimination, the EEOC issued Yowman a right-to-sue letter, and Yowman instituted this action against Jefferson County, Texas, on August 11, 2003. On January 12, 2004, prior to the transfer of the case to this court, Yowman filed, with leave of court, an amended complaint adding JCCSCD as a defendant. On January 30, 2004, pursuant to Yowman's motion, Jefferson County, Texas, was dismissed as a party.

On September 8, 2004, JCCSCD filed its motion to dismiss pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, arguing that it enjoys Eleventh Amendment immunity from Yowman's ADEA and § 1981 claims of age and race discrimination. JCCSCD also asserts that Yowman fails to state a viable Title VII race or gender claim because JCCSCD is not her employer. Lastly, JCCSCD maintains that Yowman's lawsuit is untimely because her amended complaint, adding JCCSCD as a party five months after she filed her original complaint, was not filed within ninety days of receipt of the EEOC's right-to-sue letter and does not relate back to the original complaint.

On November 15, 2004, JCCSCD filed its motion for summary judgment, arguing that it is not subject to Yowman's Title VII claim because it is not her employer. In addition, JCCSCD asserts that, as an "arm of the state," it is protected by Eleventh Amendment immunity from Yowman's ADEA and § 1981 claims. Finally, JCCSCD contends that Yowman "has failed to demonstrate a prima facie case of race, gender or age discrimination because she has not demonstrated she was treated unfavorably compared to others." Because JCCSCD's arguments concerning Yowman's ADEA, § 1981, and Title VII claims are analyzed in the context of summary judgment, only JCCSCD's untimeliness claim will be addressed in reference to dismissal.

## II. *Analysis*

### A. *Dismissal on the Pleadings Under Rule 12(c)*

JCCSCD moves for judgment on the pleadings and seeks dismissal of Yowman's claims under Rule 12(c) of the Federal Rules of Civil Procedure. Rule 12(c) provides that "[a]ny party may move for judgment on the pleadings after the pleadings are closed." *Hughes v. The Tobacco Inst., Inc.,* 278 F.3d 417, 420 (5th Cir.2001) (citing FED. R. CIV. P. 12(c)); *see Great Plains*

*Trust Co. v. Morgan Stanley Dean Witter & Co.,* 313 F.3d 305, 312 (5th Cir.2002); *Jones v. Greninger,* 188 F.3d 322, 324 (5th Cir.1999). "A motion brought pursuant to FED. R. CIV. P. 12(c) is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." *Hebert Abstract Co. v. Touchstone Props., Ltd.,* 914 F.2d 74, 76 (5th Cir.1990); *see Great Plains Trust Co.,* 313 F.3d at 312. Such motions are treated as a motion for judgment on the pleadings based on a failure to state a claim upon which relief can be granted. *See Jones,* 188 F.3d at 324. The primary focus is whether, in the light most favorable to the plaintiff, the complaint states a valid claim for relief. *See Great Plains Trust Co.,* 313 F.3d at 312; *Hughes,* 278 F.3d at 420.

"The standard for dismissal under Rule 12(c) is the same as that for dismissal for failure to state a claim under Rule 12(b)(6)." *Johnson v. Johnson,* 385 F.3d 503, 529 (5th Cir.2004) (citing *Great Plains Trust Co.,* 313 F.3d at 313 n. 8). " 'Pleadings should be construed liberally, and judgment on the pleadings is appropriate only if there are no disputed issues of fact and only questions of law remain.' " *Great Plains Trust Co.,* 313 F.3d at 312 (quoting *Hughes,* 278 F.3d at 420). In making such a determination, the court is restricted to the pleadings and must accept all allegations as true. *See Hughes,* 278 F.3d at 420 (citing *St. Paul Ins. Co. v. AFIA Worldwide Ins. Co.,* 937 F.2d 274, 279 (5th Cir. 1991)); *see also Great Plains Trust Co.,* 313 F.3d at 312. The court will not, however, accept as true conclusory allegations or unwarranted deductions of fact. *See id.* at 313. A claim may be dismissed when it is apparent that the plaintiff can prove no set of facts in support of the claim that would entitle him to relief. *See id.* (citing *Jones,* 188 F.3d at 324). " 'The issue is not whether the plaintiff will ultimately pre-

vail, but whether he is entitled to offer evidence to support his claim.' " *Id.* (citing *Jones,* 188 F.3d at 324). As such, the claim should not be dismissed unless the plaintiff would not be entitled to relief under any set of facts or any possible theory that proves consistent with the allegations in the complaint. *See id.; Jones,* 188 F.3d at 324.

### B. *Amendment of Pleadings*

Among other arguments, JCCSCD contends that Yowman "did not file suit against [JCCSCD] within the mandatory ninety days required by Title VII and [Yowman] did not serve them within 120 days required by Rule 4(m) of the Federal Rules of Civil Procedure." In response, Yowman contends that her amended complaint, adding JCCSCD as a party, relates back to her original complaint.

The Federal Rules of Civil Procedure provide that leave to amend pleadings "shall be freely given when justice so requires." FED. R. CIV. P. 15(a); *see Goldstein v. MCI WorldCom,* 340 F.3d 238, 254 (5th Cir.2003); *Coghlan v. Wellcraft Marine Corp.,* 240 F.3d 449, 452 (5th Cir. 2001). The policy of the federal rules is to permit liberal amendment to facilitate determination of claims on the merits and to prevent litigation from becoming a technical exercise in the fine points of pleading. *See Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Conley v. Gibson,* 355 U.S. 41, 48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *United States ex rel. Willard v. Humana Health Plan of Tex., Inc.,* 336 F.3d 375, 386 (5th Cir.2003); *Lowrey v. Texas A & M Univ. Sys.,* 117 F.3d 242, 245–46 (5th Cir.1997). Leave to amend, however, is by no means automatic. *See Goldstein,* 340 F.3d at 254; *Parish v. Frazier,* 195 F.3d 761, 763 (5th Cir. 1999); *Price v. Pinnacle Brands, Inc.,* 138 F.3d 602, 608 (5th Cir.1998); *In re South-*

*mark Corp.,* 88 F.3d 311, 314 (5th Cir. 1996), *cert. denied,* 519 U.S. 1057, 117 S.Ct. 686, 136 L.Ed.2d 611 (1997); *Wimm v. Jack Eckerd Corp.,* 3 F.3d 137, 139 (5th Cir.1993).

### 1. *Equitable Tolling*

■ Yowman did not seek to add JCCSCD as a defendant until after the ninety-day limitations period had expired under Title VII. *See* 42 U.S.C. § 2000e–5(e)(f). Despite the expiration of the statute of limitations, there are two avenues available for Yowman to preserve her claim against JCCSCD. *See Gibson v. Deep Delta Contractors, Inc.,* No. Civ. A. 97–3791, 2000 WL 28174, at *2 (E.D.La. Jan.14, 2000). Yowman may either avail herself of the "relation back" provision of Rule 15(c) of the Federal Rules of Civil Procedure or the doctrine of equitable tolling. *See id.* Although Yowman does not address the doctrine of equitable tolling and only briefly refers to the relation back rule, the court finds that, in the interests of justice, the application of equitable tolling is appropriate. *See id.*

"In addition to the 'relation back' principle of Rule 15(c)(3), plaintiffs who add parties after the expiration of the limitations period may be able to save their claims by demonstrating to the court that the limitations period should be equitably tolled." *Id.* at *4. Although general policy favors limitation periods, courts have extended equitable relief in some situations. *See Wilson v. Zapata Off–Shore Co.,* 939 F.2d 260, 267 (5th Cir.1991); *Gibson,* 2000 WL 28174, at *4; *see also Wilson v. United States Gov't,* 23 F.3d 559, 561 (1st Cir. 1994). While "cautious not to apply the statute of limitations too harshly," courts have recognized that the doctrine of equitable tolling "is to be applied only if the relevant facts present sufficiently 'rare and exceptional circumstances' that would warrant application of the doctrine." *Ott v. Johnson,* 192 F.3d 510, 513 (5th Cir.1999),

*cert. denied,* 529 U.S. 1099, 120 S.Ct. 1834, 146 L.Ed.2d 777 (2000); *see Gibson,* 2000 WL 28174, at *2. Courts have applied equitable tolling in cases where the plaintiff has actively pursued judicial remedies by filing a timely but defective pleading or where the plaintiff has been induced or tricked by his adversary's misconduct into allowing the filing deadline to expire. *See Wilson,* 939 F.2d at 267 (citing *Glus v. Brooklyn E. Dist. Terminal,* 359 U.S. 231, 234, 79 S.Ct. 760, 3 L.Ed.2d 770 (1959)); *Gibson,* 2000 WL 28174, at *4; *see also Ott,* 192 F.3d at 513–14. The United States Court of Appeals for the Fifth Circuit has recognized that the statute of limitations may be tolled "because of 'the plaintiff's innocence.'" *Loeber v. Bay Tankers, Inc.,* 924 F.2d 1340, 1343 (5th Cir.), *cert. denied,* 502 U.S. 819, 112 S.Ct. 78, 116 L.Ed.2d 51 (1991) (quoting *Northern Metal Co. v. United States,* 350 F.2d 833, 837 (3d Cir.1965)); *see Gibson,* 2000 WL 28174, at *2.

■ "In evaluating a claim for equitable tolling, the court should consider several factors, including whether the congressional purpose is effectuated by tolling the limitations period under the circumstances, whether the claimant has acted diligently in pursuing his or her claim, and whether the potential defendant was timely served with process." *Id.* at *4 (citing *Wilson,* 939 F.2d at 266; *Covey v. Arkansas River Co.,* 865 F.2d 660, 662 (5th Cir.1989); *Valentin v. Ocean Ships, Inc.,* 38 F.Supp.2d 511, 513 (S.D.Tex.1999)). The court must then balance the factors weighing in favor of equitable tolling against the possibility of prejudice to the defendant occasioned by the delay. *See id.* (citing *Donald v. Cook County Sheriff's Dep't,* 95 F.3d 548, 562 (7th Cir.1996)).

Here, the ninety-day limitations period for proceeding against JCCSCD is subject to equitable tolling. In light of the above

considerations, tolling the statute of limitations would further the policy and purpose of Rule 15(a), which permits the liberal amendment of pleadings when justice so requires. In this case, Yowman has acted diligently in pursuing her claims against her employer, mistakenly identified initially as Jefferson County, Texas. Given the "murky" nature of a probation officer's employer, Yowman has presented circumstances that warrant the tolling of the statute of limitations to permit her to add JCCSCD as a defendant. *See* DAVID B. BROOKS, PROBATION DEPARTMENTS, 36 TEX. PRACTICE SERIES, COUNTY AND SPECIAL DISTRICT LAW § 22.31 (2d ed.2004). In addition, the transferring court found circumstances sufficiently compelling to allow Yowman to amend her complaint for the purpose of adding JCCSCD as a defendant. Finally, in response to the court's order, signed January 12, 2004, a summons was issued, and service was timely effected on JCCSCD on January 28, 2004.

Moreover, tolling the statute of limitations does not prejudice JCCSCD, nor does JCCSCD claim that by remaining a party to this action it will be harmed or surprised in any way. The record includes an affidavit submitted by Stott on December 12, 2003, attached to Jefferson County's motion to dismiss, stating that he "was authorized to make this Affidavit," and that "he reviewed the pleadings and discovery on file in the above-styled case." Accordingly, it is apparent that JCCSCD was on notice of Yowman's lawsuit and began investigating and collecting evidence regarding her claims on or before December 12, 2003. Therefore, JCCSCD will not be prejudiced by maintaining a defense on the merits. Consequently, Yowman has presented rare and exceptional circumstances that warrant the equitable tolling of the statute of limitations, which are not outweighed by the possibility of prejudice to JCCSCD occasioned by the delay in adding it as a defendant.

### 2. Relation Back

In the alternative, Yowman's amended complaint may be considered timely if she can show that it relates back to the date the original complaint was filed. *See Hennelly v. Greenwood Cent. Sch. Dist.*, No. 02–CV–6398P, 2004 WL 1570277, at *3 (W.D.N.Y. Jun.29, 2004). In cases where a complaint is amended to add a defendant after the applicable limitation period has expired, Rule 15(c) of the Federal Rules of Civil Procedure provides for relation back to the date of the original complaint if the amendment satisfies certain requirements. *See In re Enron Corp. Secs., Derivative & "ERISA" Litig.*, 310 F.Supp.2d 819, 849 (S.D.Tex.2004). Rule 15(c), as amended in 1991 and 1993, provides for relation back if the following requirements are satisfied:

> (1) relation back is permitted by the law that provides the statute of limitations applicable to the action, or
>
> (2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, or
>
> (3) the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing provision (2) is satisfied and, *within the period provided by Rule 4(m) for service of the summons and complaint*, the party to be brought in by amendment (A) has *received such notice* of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, *but for a mistake concerning the identity of the proper party*, the action would have been brought against the party.

*Jacobsen v. Osborne*, 133 F.3d 315, 319 (5th Cir.1998) (quoting FED. R. CIV. P. 15(c)) (emphasis in original); *see In re Enron Corp. Secs., Derivative & "ERISA"*

*Litig.*, 310 F.Supp.2d at 849–50. Rule 4(m) provides:

> If service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time; provided that if the plaintiff shows good cause for the failure, the court shall extend the time for service for an appropriate period.

FED. R. CIV. P. 4(m).

■ In this case, it is undisputed that the claims asserted against the additional party, JCCSCD, arose out of the conduct, transaction, or occurrence set forth in Yowman's original complaint. *See Jacobsen*, 133 F.3d at 320. With respect to notice, while a court may enlarge the time for service upon a showing of good cause, the court may also extend the time for service " 'even if there is no good cause shown.' " *Henderson v. United States*, 517 U.S. 654, 658 n. 5, 116 S.Ct. 1638, 134 L.Ed.2d 880 (1996) (quoting Advisory Committee's Notes on 1993 Amendments to FED. R. CIV. P. 4, 28 U.S.C.App., p. 654). As such, the transferring court's order granting Yowman leave to file an amended complaint, adding JCCSCD as a defendant, may be construed as a discretionary extension of time for service to be effected, thereby satisfying the notice requirement for relation back under Rule 15(c).

The policy objective behind the notice requirement in Rule 15(c) is to ensure that the parties to be added receive such notice that they will not be prejudiced in defending the case on the merits. *See Honeycutt v. Long*, 861 F.2d 1346, 1354 (5th Cir. 1988); *Kirk v. Cronvich*, 629 F.2d 404, 408 (5th Cir.1980); *Ramirez v. Burr*, 607 F.Supp. 170, 174 (S.D.Tex.1984). Stott's affidavit establishes that JCCSCD was aware of Yowman's lawsuit shortly after it was filed against Jefferson County, Texas. Therefore, notice was sufficient to prevent JCCSCD from being prejudiced in maintaining a defense on the merits. *See Kirk*, 629 F.2d at 408; *Johnson v. Sawyer*, 640 F.Supp. 1126, 1135 (S.D.Tex.1986); *Ramirez*, 607 F.Supp. at 174.

■ Finally, JCCSCD knew or should have known that, but for a mistake concerning the identity of the proper party, the action would likely have been brought against it. *See* FED. R. CIV. P. 15(c). "Where the change in naming parties or substituting new parties was not the result of a *mistake*, i.e., misidentification or misnomer, but rather because the plaintiff did not know the identity of the defendant originally, the relation-back doctrine does not apply." *In re Enron Corp. Secs., Derivative & "ERISA" Litig.*, 310 F.Supp.2d at 852 (citing *Jacobsen*, 133 F.3d at 320–21) (emphasis in original). In this instance, JCCSCD knew or should have known that Yowman, in filing an employment discrimination claim, had every intention of bringing a lawsuit against her employer, whoever her employer might be, and that such failure to name JCCSCD stemmed from a "mistake concerning the identity of the proper party." *Montalvo v. Tower Life Bldg.*, 426 F.2d 1135, 1147 (5th Cir.1970).

Accordingly, due to the vagaries surrounding the designation of Yowman's employer, JCCSCD knew or should have known that, but for the mistaken naming of Jefferson County, the action likely would have been brought against JCCSCD. Thus, Yowman's amended complaint, adding JCCSCD as a defendant, relates back to the original filing, and, therefore, was not untimely.

*C. Summary Judgment Standard*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judg-

ment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Martinez v. Schlumberger, Ltd.*, 338 F.3d 407, 411 (5th Cir. 2003); *Terrebonne Parish Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 877 (5th Cir. 2002); *Colson v. Grohman*, 174 F.3d 498, 506 (5th Cir.1999).

"A fact is *'material'* if it *'might affect* the outcome of the suit under governing law.'" *Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir.2001) (emphasis in original) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505); *see Harken Exploration Co. v. Sphere Drake Ins. PLC*, 261 F.3d 466, 471 (5th Cir.2001); *Merritt–Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir.1999); *Burgos v. Southwestern Bell Tel. Co.*, 20 F.3d 633, 635 (5th Cir.1994). "An issue is *'genuine'* if it is real and substantial, as opposed to merely formal, pretended, or a sham." *Bazan*, 246 F.3d at 489 (emphasis in original). Thus, a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *accord Harken Exploration Co.*, 261 F.3d at 471; *Merritt–Campbell, Inc.*, 164 F.3d at 961. The moving party, however, needs not negate the elements of the nonmovant's case. *See Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir.1996) (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994)).

Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials in the pleadings but must present affirmative evidence, setting forth specific facts, to show the existence of a genuine issue for trial. *See Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 505 (5th Cir.1999), *cert. denied*, 528 U.S. 1160, 120 S.Ct. 1171, 145 L.Ed.2d 1080 (2000); *Wallace*, 80 F.3d at 1047; *Little*, 37 F.3d at 1075. "[T]he court must review the record 'taken as a whole.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348). All the evidence must be construed "in the light most favorable to the nonmoving party without weighing the evidence, assessing its probative value, or resolving any factual disputes." *Williams v. Time Warner Operation, Inc.*, 98 F.3d 179, 181 (5th Cir.1996); *see Reeves*, 530 U.S. at 150, 120 S.Ct. 2097; *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003); *Harken Exploration Co.*, 261 F.3d at 471; *Daniels v. City of Arlington*, 246 F.3d 500, 502 (5th Cir.), *cert. denied*, 534 U.S. 951, 122 S.Ct. 347, 151 L.Ed.2d 262 (2001); *Colson*, 174 F.3d at 506. The evidence of the nonmovant is to be believed, with all justifiable inferences drawn and all reasonable doubts resolved in her favor. *See Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49 n. 5, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990) (citing *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505); *Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409, 412 (5th Cir.

2003); *Martinez*, 338 F.3d at 411; *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 507 (5th Cir.), *cert. denied*, 540 U.S. 815, 124 S.Ct. 66, 157 L.Ed.2d 30 (2003); *Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 372 (5th Cir.2002); *Harken Exploration Co.*, 261 F.3d at 471.

Nevertheless, " 'only *reasonable* inferences can be drawn from the evidence in favor of the nonmoving party.' " *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 469 n. 14, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (emphasis in original) (quoting *H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1012 (2d Cir.1989)). "If the [nonmoving party's] theory is . . . senseless, no reasonable jury could find in its favor, and summary judgment should be granted." *Id.* at 468–69, 112 S.Ct. 2072. The nonmovant's burden is not satisfied by "some metaphysical doubt as to material facts," conclusory allegations, unsubstantiated assertions, speculation, the mere existence of some alleged factual dispute, or "only a scintilla of evidence." *Little*, 37 F.3d at 1075; *see Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505; *Wallace*, 80 F.3d at 1047; *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir.1996) (citing *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994)). "Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Brown*, 337 F.3d at 541; *see Bridgmon v. Array Sys. Corp.*, 325 F.3d 572, 577 (5th Cir. 2003); *Hugh Symons Group, plc v. Motorola, Inc.*, 292 F.3d 466, 468 (5th Cir.), *cert. denied*, 537 U.S. 950, 123 S.Ct. 386, 154 L.Ed.2d 295 (2002).

Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to her case on which she bears the burden of proof at trial. *See*

*Nebraska v. Wyoming*, 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993); *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548; *Wenner v. Texas Lottery Comm'n*, 123 F.3d 321, 324 (5th Cir.1997), *cert. denied*, 523 U.S. 1073, 118 S.Ct. 1514, 140 L.Ed.2d 667 (1998). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548.

### D. *Effect of No Response to Motion*

■ Here, Yowman, the non-moving party, has not filed a timely response and has proffered no evidence in opposition to JCCSCD's motion for summary judgment. Summary judgment may not be awarded by default, however, merely because the non-moving party has failed to respond. *See Hibernia Nat'l Bank v. Administracion Cent. Sociedad Anonima*, 776 F.2d 1277, 1279 (5th Cir.1985); *see also United States v. Wilson*, 113 Fed.Appx. 17, 18 (5th Cir.2004). "A motion for summary judgment cannot be granted simply because there is no opposition, even if failure to oppose violated a local rule. The movant has the burden of establishing the absence of a genuine issue of material fact and, unless he has done so, the court may not grant the motion, regardless of whether any response was filed." *Hetzel v. Bethlehem Steel Corp.*, 50 F.3d 360, 362 n. 3 (5th Cir.1995) (citing *Hibernia Nat'l Bank*, 776 F.2d at 1279).

Nonetheless, the court may grant summary judgment if the movant has made a *prima facie* showing that it is entitled to such relief. *See Eversley v. MBank Dallas*, 843 F.2d 172, 174 (5th Cir.1988); FED. R. CIV. P. 56(e). The court may also accept as undisputed the facts set forth in

support of the unopposed motion for summary judgment. *See Eversley*, 843 F.2d at 174; *Perry Williams, Inc. v. FDIC*, 47 F.Supp.2d 804, 809 (N.D.Tex.1999); *Rayha v. United Parcel Serv., Inc.*, 940 F.Supp. 1066, 1068 (S.D.Tex.1996).

### E. *Eleventh Amendment Immunity*

█ JCCSCD contends that it is an "arm of the state" and thus entitled to Eleventh Amendment immunity from Yowman's claims brought pursuant to 42 U.S.C. §§ 1981 and 1981(a) and the ADEA. It is well recognized that "[f]ederal court jurisdiction is limited by the Eleventh Amendment and the principle of sovereign immunity that it embodies." *Vogt v. Board of Comm'rs of the Orleans Levee Dist.*, 294 F.3d 684, 688 (5th Cir.), *cert. denied*, 537 U.S. 1088, 123 S.Ct. 700, 154 L.Ed.2d 632 (2002). The Eleventh Amendment to the United States Constitution provides:

> The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. CONST. amend. XI. Absent waiver by the state of sovereign immunity or a valid congressional override, the Eleventh Amendment bars the institution of a damages action in federal court against a state or state instrumentality. *See Kentucky v. Graham*, 473 U.S. 159, 169, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); *Martinez v. Texas Dep't of Crim. Justice*, 300 F.3d 567, 572–73 (5th Cir.2002); *Vogt*, 294 F.3d at 688; *Sherwinski v. Peterson*, 98 F.3d 849, 851 (5th Cir.1996); *Ganther v. Ingle*, 75 F.3d 207, 209 (5th Cir.1996).

The Fifth Circuit has held that "eleventh amendment immunity is a jurisdictional issue that 'cannot be ignored, for a meritorious claim to that immunity deprives the court of subject matter jurisdiction of the action.'" *McDonald v. Board of Miss. Levee Comm'rs*, 832 F.2d 901, 906 (5th Cir.1987) (quoting *Crane v. Texas*, 759 F.2d 412, 415 (5th Cir.), *cert. denied*, 474 U.S. 1020, 106 S.Ct. 570, 88 L.Ed.2d 555 (1985)). As the Fifth Circuit explained in *Clay v. Texas Women's Univ.*:

> The eleventh amendment clearly interposes a jurisdictional bar to suits against a state by private parties who seek monetary relief from the state in the form of compensatory damages, punitive damages, or monetary awards in the nature of equitable restitution, and also to suits against a state agency or state official when the monied award is to be paid from the state treasury.

728 F.2d 714, 715 (5th Cir.1984).

█ For over a century, the United States Supreme Court has "made clear that the Constitution does not provide for federal jurisdiction over suits against non-consenting States." *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 73, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000). Eleventh Amendment immunity extends to suits brought against a state by its own citizens as well as by citizens of another state or foreign country. *See Lapides v. Board of Regents of the Univ. Sys. of Ga.*, 535 U.S. 613, 616, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002); *Pennhurst State Sch. & Hosp.*, 465 U.S. at 99–100, 104 S.Ct. 900; *Edelman v. Jordan*, 415 U.S. 651, 662–63, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Vogt*, 294 F.3d at 688; *United States v. Texas Tech Univ.*, 171 F.3d 279, 288–89 (5th Cir.1999), *cert. denied*, 530 U.S. 1202, 120 S.Ct. 2194, 147 L.Ed.2d 231 (2000); *Sherwinski*, 98 F.3d at 851. Furthermore, "[i]t has long been settled that the reference to actions 'against one of the United States' encompasses not only actions in which a State is

actually named as the defendant, but also certain actions against state agents and state instrumentalities." *Regents of the Univ. of Cal. v. Doe,* 519 U.S. 425, 429, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997); *accord Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 144, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993) ("[a]bsent waiver, neither a State nor agencies acting under its control may 'be subject to suit in federal court' ").

▆▆▆ Thus, "[e]ven in cases where the State itself is not a named defendant, the State's Eleventh Amendment immunity will extend to any state agency or other political entity that is deemed the 'alter ego' or an 'arm' of the State." *Vogt,* 294 F.3d at 688–89 (citing *Doe,* 519 U.S. at 429, 117 S.Ct. 900). "In other words, the Eleventh Amendment will bar a suit if the defendant state agency is so closely connected to the State that the State itself is 'the real, substantial party in interest.' " *Id.* at 689 (quoting *Hudson v. City of New Orleans,* 174 F.3d 677, 681 (5th Cir.), *cert. denied,* 528 U.S. 1004, 120 S.Ct. 498, 145 L.Ed.2d 385 (1999)). "The Eleventh Amendment will not bar a suit, though, if the political entity 'possesses an identity sufficiently distinct' from that of the State." *Id.* (citing *Pendergrass v. Greater New Orleans Expressway Comm'n,* 144 F.3d 342, 344 (5th Cir.), *cert. denied,* 525 U.S. 1054, 119 S.Ct. 617, 142 L.Ed.2d 557 (1998)).

▆▆▆ As the Fifth Circuit has recognized, "[t]here is no bright-line test for determining whether a political entity is an 'arm of the State' for purposes of Eleventh Amendment immunity." *Id.* "Instead, 'the matter is determined by reasoned judgment about whether the lawsuit is one which, despite the presence of a state agency as the nominal defendant, is effectively against the sovereign state.' " *Id.* (quoting *Earles v. State Bd. of Certified Pub. Accountants of La.,* 139 F.3d 1033,

1037 (5th Cir.), *cert. denied,* 525 U.S. 982, 119 S.Ct. 444, 142 L.Ed.2d 399 (1998)). Therefore, when faced with a question of Eleventh Amendment immunity, the court must inquire into the relationship between the state and the entity in question. *See Doe,* 519 U.S. at 429, 117 S.Ct. 900. In doing so, the court "must examine the particular entity in question and its powers and characteristics as created by state law to determine whether the suit is in reality a suit against the state itself." *Laje v. R.E. Thomason Gen. Hosp.,* 665 F.2d 724, 727 (5th Cir.1982) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Hander v. San Jacinto Jr. Coll.,* 519 F.2d 273, 279 (5th Cir.1975)); *see Clark v. Tarrant County,* 798 F.2d 736, 744 (5th Cir.1986); *Sessions v. Rusk State Hosp.,* 648 F.2d 1066, 1069 (5th Cir.1981).

▆▆▆ In making this inquiry, the Fifth Circuit traditionally has considered six factors:

(1) whether state statutes and case law characterize the agency as an arm of the state; (2) the source of funds for the entity; (3) the degree of local autonomy the entity enjoys; (4) whether the entity is concerned primarily with local, as opposed to statewide, problems; (5) whether the entity has authority to sue and be sued in its own name; and (6) whether the entity has the right to hold and use property.

*Vogt,* 294 F.3d at 689 (citing *Cozzo v. Tangipahoa Parish Council–President Gov't,* 279 F.3d 273, 281 (5th Cir.2002); *Anderson v. Red River Waterway Comm'n,* 231 F.3d 211, 214 (5th Cir.2000)); *see United States ex rel. Barron v. Deloitte & Touche, L.L.P.,* 381 F.3d 438, 440 (5th Cir.2004). " '[T]he most significant factor in assessing an entity's status is whether a judgment against it will be paid with state funds.' " *Vogt,* 294 F.3d at 689 (quoting

*Delahoussaye v. City of New Iberia,* 937 F.2d 144, 147–48 (5th Cir.1991)). "[T]he rule has evolved that a suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment." *Edelman,* 415 U.S. at 663, 94 S.Ct. 1347. Hence, where it is apparent that the state is the real party in interest to a suit and that any monetary award against a state official or entity would be satisfied by state funds, the suit is foreclosed by the Eleventh Amendment. *See Quern v. Jordan,* 440 U.S. 332, 335–37, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979); *Edelman,* 415 U.S. at 663, 94 S.Ct. 1347; *Laje,* 665 F.2d at 727.

While a state's sovereign immunity may be waived and a state may consent to suit against it in federal court, the Supreme Court has insisted that "the State's consent be unequivocally expressed." *Pennhurst State Sch. & Hosp.,* 465 U.S. at 99, 104 S.Ct. 900 (citing *Edelman,* 415 U.S. at 673, 94 S.Ct. 1347). It is well established that "a waiver of sovereign immunity must be specific and explicit" and cannot be readily implied. *Petterway v. Veterans Admin. Hosp.,* 495 F.2d 1223, 1225 n. 3 (5th Cir.1974); *accord Pennhurst State Sch. & Hosp.,* 465 U.S. at 99, 104 S.Ct. 900; *Idoux v. Lamar Univ. Sys.,* 817 F.Supp. 637, 641 (E.D.Tex.1993). "Waiver may be found only where the waiver is express or the inference of waiver is overwhelming." *Id.*

To determine whether Congress has abrogated the states' sovereign immunity through the enactment of a federal statute, a two-step analysis is utilized. *See Kimel,* 528 U.S. at 73, 120 S.Ct. 631 (citing *Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 55, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996)); *Texas Tech Univ.,* 171 F.3d at 283. First, a court must determine whether Congress has "unequivocally expressed its intent to abrogate that immunity." *Kimel,* 528 U.S. at 73, 120 S.Ct. 631 (citing *Seminole Tribe of Fla.,* 517 U.S. at 55, 116 S.Ct. 1114); *accord Texas Tech Univ.,* 171 F.3d at 283. " ' "Congress may abrogate the States' constitutionally secured immunity from suit in federal court only by making its intention unmistakably clear in the language of the statute." ' " *Kimel,* 528 U.S. at 73, 120 S.Ct. 631 (quoting *Dellmuth v. Muth,* 491 U.S. 223, 228, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989) (quoting *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 242, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985))). Second, the court must determine whether Congress has "acted pursuant to a valid grant of constitutional authority." *Id.* (citing *Seminole Tribe of Fla.,* 517 U.S. at 55, 116 S.Ct. 1114); *accord Texas Tech Univ.,* 171 F.3d at 283. With regard to the second inquiry, the Supreme Court has held that Congress could not abrogate Eleventh Amendment immunity simply by enacting legislation under its general grant of Article I legislative powers. *See Kimel,* 528 U.S. at 78, 120 S.Ct. 631 (citing *Seminole Tribe of Fla.,* 517 U.S. at 72–73, 116 S.Ct. 1114); *accord Texas Tech Univ.,* 171 F.3d at 283. Controlling Supreme Court precedent has recognized only one valid source of Congressional power that would allow the abrogation of a state's immunity from suit by its citizens—Section 5 of the Fourteenth Amendment. *See Kimel,* 528 U.S. at 80, 120 S.Ct. 631; *Seminole Tribe of Fla.,* 517 U.S. at 59, 72–73, 116 S.Ct. 1114; *Texas Tech Univ.,* 171 F.3d at 283. " '[T]he Eleventh Amendment, and the principle of state sovereignty which it embodies, are necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment.' " *Kimel,* 528 U.S. at 80, 120 S.Ct. 631 (quoting *Fitzpatrick v. Bitzer,* 427 U.S. 445, 456, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976)).

### 1. *Section 1981 Claims*

 Yowman alleges that JCCSCD discriminated against her because of her race in violation of 42 U.S.C. §§ 1981 and 1981a. The Civil Rights Act of 1866, 42 U.S.C. § 1981, provides in relevant part:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a). Section 1981 prohibits racial discrimination, both public and private, in the making or enforcement of contracts. *See Olmstead v. Zimring*, 527 U.S. 581, 617 n. 1, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999); *Saint Francis Coll. v. Al–Khazraji*, 481 U.S. 604, 609, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987); *Runyon v. McCrary*, 427 U.S. 160, 168, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976); *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 459–60, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975); *Felton v. Polles*, 315 F.3d 470, 480 (5th Cir.2002). Congress initially enacted § 1981 as part of the Civil Rights Act of 1866 pursuant to § 2 of the Thirteenth Amendment. *See Edwards v. Jewish Hosp. of St. Louis*, 855 F.2d 1345, 1348 (8th Cir.1988). " 'The legislative history of the 1866 Act clearly indicates that Congress intended to protect a limited category of rights, specifically defined in terms of racial equality.' " *General Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 384, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982) (quoting *Georgia v. Rachel*, 384 U.S. 780, 791, 86 S.Ct. 1783, 16 L.Ed.2d 925 (1966)).

Section 1981 was amended by the Civil Rights Act of 1991, which added subsections (b) and (c). *See Felton*, 315 F.3d at 480. Subsection (b) defines the term "make and enforce contracts," as follows:

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

42 U.S.C. § 1981(b). Subsection (c) clarifies the scope of the statute's protection:

The rights protected by this section are protected against impairment by non-governmental discrimination and impairment under color of State law.

42 U.S.C. § 1981(c). This amendment was " 'designed to restore and strengthen civil rights laws that ban discrimination in employment.' " *Fadeyi v. Planned Parenthood Ass'n of Lubbock, Inc.*, 160 F.3d 1048, 1050 (5th Cir.1998) (quoting H.R.Rep. No. 102–40(II), 102d Cong., 1st Sess., at 2 (1991), reprinted in 1991 U.S.C.C.A.N. 694, 694). "As a general matter, section 1981 serves as a deterrent to employment discrimination and a means of punishing employers who discriminate on the basis of race. Section 1981 also provides a means of compensating a victim of racial discrimination." *Carroll v. General Accident Ins. Co. of Am.*, 891 F.2d 1174, 1176 (5th Cir.1990).

 The Civil Rights Act of 1991, 42 U.S.C. § 1981a, provides a prevailing plaintiff in an intentional employment discrimination case the ability to recover compensatory and punitive damages from the defendant. *See* 42 U.S.C. § 1981a(a); *Huckabay v. Moore*, 142 F.3d 233, 241 (1998). It applies not only to actions brought under Title VII of the Civil Rights Act of 1964, but also to actions brought under the ADA and the Rehabilitation Act. *See* 42 U.S.C. § 1981a(a)(2). This statute does not create a new substantive right or

an independent cause of action; rather, it "enhances the remedies otherwise available for intentional employment discrimination." *Perry v. Dallas Indep. Sch. Dist.,* No. CIV. A. 3:96–CV–2855D, 1998 WL 614668, at *1 n. 1 (N.D.Tex. Sept.2, 1998); *see Huckabay,* 142 F.3d at 241; *Presutti v. Felton Brush, Inc.,* 927 F.Supp. 545, 550 (D.N.H.1995); *Swartzbaugh v. State Farm Ins. Cos.,* 924 F.Supp. 932, 934 (E.D.Mo. 1995).

"Implicit in § 1981a is the requisite that an action will not exist under the Civil Rights Act absent a primary claim under another substantive act." *Presutti,* 927 F.Supp. at 550 (citing *West v. Boeing Co.,* 851 F.Supp. 395, 401 (D.Kan.1994)). In short, "[t]here is no such thing" as a § 1981a claim. *Perry,* 1998 WL 614668, at *1; *accord Gates v. City of Dallas,* No. CIV. A. 3:96–CV–2198–D, 1998 WL 133004, at *7 (N.D.Tex. Mar.18, 1998). As this provision merely provides remedies supplemental to those already available, it applies only if the plaintiff otherwise establishes intentional discrimination on the part of the employer under another substantive act. *See Huckabay,* 142 F.3d at 241; *Presutti,* 927 F.Supp. at 550.

■ With respect to immunity, the Fifth Circuit "has concluded that § 1981 contains no express waiver of the state's Eleventh Amendment immunity, and thus § 1981 claims against a state or state agency are barred by the Eleventh Amendment." *Jackson v. Texas Forest Serv.,* 194 F.Supp.2d 566, 570 (E.D.Tex. 2001) (citing *Sessions,* 648 F.2d at 1069). In determining whether JCCSCD is an "arm of the state," the court must evaluate its powers and characteristics under state law. *See Clark,* 798 F.2d at 744. Applying the six-factor test set forth by the Fifth Circuit above, the court must first determine whether state statutes and case law view a community supervision department, formerly known as a probation de-partment, as an "arm of the state." *See Vogt,* 294 F.3d at 689; *Clark,* 798 F.2d at 744 (citing *Jacintoport Corp. v. Greater Baton Rouge Port Comm'n,* 762 F.2d 435, 438–40 (5th Cir.1985), *cert. denied,* 474 U.S. 1057, 106 S.Ct. 797, 88 L.Ed.2d 774 (1986); *United Carolina Bank v. Board of Regents of Stephen F. Austin State Univ.,* 665 F.2d 553, 557–58 (5th Cir.1982)).

Article 42.12, sections 1 and 10(a), of the Texas Code of Criminal Procedure "gives control of the Adult Probation offices to the district judges, who are undeniably elected state officials." *Clark,* 798 F.2d at 744; *see* TEX. CODE CRIM. PROC. ANN. art. 42.12, §§ 1, 10(a) (Vernon 2004); *PYCA Indus., Inc. v. Harrison County Waste Water Mgmt. Dist.,* 81 F.3d 1412, 1417 n. 3 (5th Cir.1996). In addition, section 76.002 of the Texas Government Code empowers the state district judge or district judges to establish a community supervision department and employ district personnel to perform the duties of the department, such as conducting presentence investigations, supervising and rehabilitating defendants on community supervision, and enforcing the conditions of community supervision. *See* TEX. GOV'T CODE ANN. § 76.002 (Vernon 2004). Moreover, the Texas Attorney General has opined that, in hiring community supervision personnel, "it is the judges, not the director, who are ultimately responsible to appoint department personnel." OP. TEX. ATT'Y GEN. No. JC–0314 (2000); *see Clark,* 798 F.2d at 744 (citing OP. TEX. ATT'Y GEN. No. JM–410 (1985)). In addition, the attorney general's opinion explains that "adult probation department officers and employees are employees of the judicial district they serve." OP. TEX. ATT'Y GEN. No. JC–0314; *see Hardin County Comty. Supervision & Corrs. Dep't v. Sullivan,* 106 S.W.3d 186, 189 (Tex.App.—Austin 2003, pet. denied). "While Texas attorney generals' opinions do not carry the decisive weight of caselaw, they are

entitled to careful consideration by the courts and are generally regarded as highly persuasive." *Shore v. Howard,* 414 F.Supp. 379, 390 (N.D.Tex.1976); *see Sullivan,* 106 S.W.3d at 189.

The purpose of the second factor, the source of the entity's funding, serves to fulfill the Eleventh Amendment's goal of protecting state treasuries. *See Clark,* 798 F.2d at 744; *see also Perez v. Region 20 Educ. Serv. Ctr.,* 307 F.3d 318, 327 (5th Cir.2002). "Part of Adult Probation's funding comes from the state and part from probation fees." *Clark,* 798 F.2d at 744; *see Flores v. Cameron County,* 92 F.3d 258, 268 (5th Cir.1996). Moreover, one of the functions of the CJAD is to provide state aid, appropriated by the legislature, to judicial districts to provide financial assistance to "the development and improvement of community supervision services and community-based correctional programs." TEX. GOV'T CODE ANN. § 509.001(4)(A)(ii) (Vernon 2004). Further, it is the responsibility of the judges of the state judicial district to employ district personnel to staff the community supervision department. *See* TEX. GOV'T CODE ANN. § 76.002(a)(2). As a consequence, a community supervision department receives a substantial portion of its funds from the state treasury. *See PYCA Indus., Inc.,* 81 F.3d at 1417 n. 3.

The third factor is the degree of local autonomy the entity enjoys. *See Vogt,* 294 F.3d at 689; *Clark,* 798 F.2d at 744. "The statute gives responsibility for the probation departments to the district judges, who are elected officials." *Id.; see* TEX. GOV'T CODE ANN. § 76.002(a)(2). The establishment of community supervision departments is tied to judicial districts and not county lines. *See id.* Although the county commissioners may be required to approve the budget, "Texas courts have held that the commissioners can be mandamused to provide the funds." *Clark,* 798

F.2d at 744–45 (citing *Commissioners' Ct. of Hays County v. District Judge 22nd Jud. Dist.,* 506 S.W.2d 630, 635–36 (Tex. Civ.App.—Austin 1974, writ ref'd n.r.e.)). Because the control and management of a community supervision department is controlled by the elected state district judges, who derive their power from the judicial article of the state constitution and not from the county, there is little evidence of local autonomy. *See id.* at 744.

The next factor in determining Eleventh Amendment immunity is whether the entity is concerned primarily with local, as opposed to statewide, problems. *See Vogt,* 294 F.3d at 689; *Clark,* 798 F.2d at 744. Although it may appear that a community supervision department is involved only with county probationers, the "coincidence of county lines and judicial districts is not required." *Id.* at 745. "The statute was enacted to address a statewide problem and to put control of probationers in the hands of state officers." *Id.* (citing OP. TEX. ATT'Y GEN. No. JM–410 (1985)). Thus, the division of responsibilities into judicial districts is an administrative tool for controlling a statewide program. *See id.; see also PYCA Indus., Inc.,* 81 F.3d at 1417 n. 3.

The final two factors involve whether the entity has the authority to sue and be sued in its own name and whether it has the right to hold and use property. *See Vogt,* 294 F.3d at 689; *Clark,* 798 F.2d at 744. Community supervision employees are considered employees of the state for purposes of suits involving negligence or violations of state or federal constitutional rights. *See id.* "Adult Probation is not given the right to sue or be sued in its own name." *Id.; see PYCA Indus., Inc.,* 81 F.3d at 1417 n. 3. Further, there is no indication in the statute that, in establishing a community supervision department, the department has the ability to hold

property in its own name or otherwise. *See Clark,* 798 F.2d at 744; *see also PYCA Indus., Inc.,* 81 F.3d at 1417 n. 3.

While no one factor conclusively establishes that JCCSCD is an "arm of the state," considering all the factors together, the court finds that JCCSCD is a state instrumentality and is immune from suit within the purview of the Eleventh Amendment. *See Flores,* 92 F.3d at 268; *PYCA Indus., Inc.,* 81 F.3d at 1417 n. 3; *Clark,* 798 F.2d at 744. Thus, because JCCSCD is entitled to Eleventh Amendment immunity, Yowman has no viable cause of action against JCCSCD under 42 U.S.C. §§ 1981 or 1981a. *See McDonald,* 832 F.2d at 908 n. 9 (citing *Clark,* 798 F.2d at 745); *Sullivan,* 106 S.W.3d at 190; *see also O'Reilly v. Montgomery County,* No. 102CV1242–DFH, 2003 WL 23101795, at *11 (S.D.Ind. Feb.24, 2003).

### 2. *ADEA Claim*

In her amended complaint, Yowman asserts a cause of action for age discrimination against JCCSCD pursuant to the ADEA. The ADEA provides that "it shall be unlawful for an employer ... to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1); *see Reeves,* 530 U.S. at 141, 120 S.Ct. 2097; *Rachid v. Jack in the Box, Inc.,* 376 F.3d 305, 308–09 (5th Cir.2004); *Brown v. CSC Logic, Inc.,* 82 F.3d 651, 654 (5th Cir.1996); *Stults v. Conoco, Inc.,* 76 F.3d 651, 655 (5th Cir.1996); *Armendariz v. Pinkerton Tobacco Co.,* 58 F.3d 144, 149 (5th Cir. 1995), *cert. denied,* 516 U.S. 1047, 116 S.Ct. 709, 133 L.Ed.2d 664 (1996); *EEOC v. Louisiana Office of Cmty. Servs.,* 47 F.3d 1438, 1443 (5th Cir.1995). In essence, the ADEA makes it unlawful for an employee, who is at least forty years old, to be discharged or otherwise

subjected to an adverse employment action because of his age. *See Rutland v. Moore,* 54 F.3d 226, 228 (5th Cir.1995) (citing 29 U.S.C. §§ 623(a), 631(a)).

█ In view of JCCSCD's status as a state entity, the court must ascertain whether Yowman's ADEA claim is barred under the doctrine of Eleventh Amendment immunity. *See Lowery v. University of Houston—Clear Lake,* 82 F.Supp.2d 689, 693 (S.D.Tex.2000). In *Kimel,* the United States Supreme Court "held that the Age Discrimination in Employment Act of 1967 ('ADEA'), 29 U.S.C. § 621, although containing a clear statement of Congress's intent to abrogate state immunity, was not a valid exercise of Congress's power under § 5 of the Fourteenth Amendment to abrogate state immunity and extend liability to the states." *Siler–Khodr v. University of Tex. Health Sci. Ctr. San Antonio,* 261 F.3d 542, 549 (5th Cir.2001), *cert. denied,* 537 U.S. 1087, 123 S.Ct. 694, 154 L.Ed.2d 631 (2002) (citing *Kimel,* 528 U.S. at 78–80, 120 S.Ct. 631); *see Raygor v. Regents of the Univ. of Minn.,* 534 U.S. 533, 537, 122 S.Ct. 999, 152 L.Ed.2d 27 (2002). In this situation, because Texas has not waived its sovereign immunity with respect to ADEA claims and JCCSCD is an "arm of the state," Yowman's age discrimination action is barred by the Eleventh Amendment. *See Lowery,* 82 F.Supp.2d at 693; *Rodriguez v. Pearce,* No. Civ. A. 3:02–CV–1580, 2002 WL 31875572, at *1 (N.D.Tex. Dec.18, 2002).

### F. *Title VII*

█ Yowman has also alleged causes of action for race and gender discrimination against JCCSCD under Title VII of the Civil Rights Act of 1964. JCCSCD argues that Yowman's Title VII claims fail because JCCSCD is not Yowman's employer. JCCSCD contends that because the dis-

trict judges have the authority, under Texas law, to employ, manage, and pay the staff of the JCCSCD, the judicial district is Yowman's employer, not JCCSCD.

 Title VII permits employees to sue their employers for discriminatory employment actions. *See Oden v. Oktibbeha County*, 246 F.3d 458, 465 (5th Cir.), *cert. denied*, 534 U.S. 948, 122 S.Ct. 341, 151 L.Ed.2d 258 (2001). Title VII provides that "[i]t shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1); *see Desert Palace, Inc. v. Costa*, 539 U.S. 90, 92–93, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003). "The purposes of Title VII are to achieve equality of employment opportunity and to make persons whole for injuries suffered on account of unlawful employment discrimination." *Floca v. Homcare Health Servs., Inc.*, 845 F.2d 108, 111 (5th Cir. 1988) (citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 417, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975)).

 "[I]t is well-settled that an employee-employer relationship is an absolute prerequisite to claims filed pursuant to Title VII." *Johnson v. Crown Enters., Inc.*, 294 F.Supp.2d 850, 854 (M.D.La.2003), *aff'd in part, rev'd in part on other grounds*, 398 F.3d 339 (5th Cir.2005); *see also Deal v. State Farm County Mut. Ins. Co.*, 5 F.3d 117, 118 n. 2 (5th Cir.1993). "The plaintiff's status as an 'employee' and the defendant's status as an 'employer' are jurisdictional requirements for recovery under Title VII." *Santerre v. Agip Petroleum Co., Inc.*, 45 F.Supp.2d 558, 572 (S.D.Tex.1999); *see EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 259, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991). The determination of whether a defendant is an employer under Title VII involves a two-step process. *See Deal*, 5 F.3d at 118 n. 2. The defendant must meet the statutory definition of an employer, and there must be an employment relationship between the plaintiff and the defendant. *See id.* (citing *Fields v. Hallsville Indep. Sch. Dist.*, 906 F.2d 1017, 1019 (5th Cir.1990), *cert. denied*, 498 U.S. 1026, 111 S.Ct. 676, 112 L.Ed.2d 668 (1991)); *Maxwell v. Kight*, 974 F.Supp. 899, 903 n. 3 (E.D.Tex.1996). The failure of the defendant to qualify as an employer precludes liability under Title VII and divests the court of jurisdiction. *See Arbaugh v. Y & H Corp.*, 380 F.3d 219, 231 (5th Cir.2004); *Greenlees v. Eidenmuller Enters., Inc.*, 32 F.3d 197, 198–99 (5th Cir.1994).

 "Federal law controls whether a person is an employer under Title VII, but courts can look to state law to understand the nature of the employment relationship." *Oden*, 246 F.3d at 465 (citing *Calderon v. Martin County*, 639 F.2d 271, 273 (5th Cir.1981)). Under Title VII, an employer is defined as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day … and any agent of such a person …." 42 U.S.C. § 2000e(b); *see Oden*, 246 F.3d at 465. "A person 'includes one or more individuals, governments, governmental agencies, [or] political subdivisions ….'" *Id.* (quoting 42 U.S.C. § 2000e(a)). Under Texas law, an employer is defined as:

(A) a person who is engaged in an industry affecting commerce and who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year;

(B) an agent of a person described by Paragraph (A);

(C) an individual elected to public office in this state or a political subdivision of this state; or

(D) a county, municipality, state agency, or state instrumentality, regardless of the number of individual employed.

■ To determine whether an employment relationship exists under Title VII, a " 'hybrid economic realities/common law control test' " applies. *Deal*, 5 F.3d at 119 (quoting *Fields*, 906 F.2d at 1019); *see Arbaugh*, 380 F.3d at 226. "[T]he most important factor is 'the extent of the employer's right to control the 'means and manner' of the worker's performance.' "[1] *Id.* (quoting *Bloom v. Bexar County*, 130 F.3d 722, 726 (5th Cir.1997)); *see Deal*, 5 F.3d at 119. In examining the control factor, courts have focused on whether the alleged employer has the ability to hire and fire the employee, the right to supervise the employee, and the right to set the employee's work schedule. *See id.* (citing *Fields*, 906 F.2d at 1020; *Mares v. Marsh*, 777 F.2d 1066, 1068 (5th Cir.1985)). "The economic realities component of [the] test has focused on whether the alleged employer paid the employee's salary, withheld taxes, provided benefits, and set the terms and conditions of employment." *Id.*

As discussed previously, Texas law vests the state district judges with the authority to establish and control JCCSCD. *See* Tex. Gov't Code Ann. § 76.002; *PYCA Indus., Inc.*, 81 F.3d at 1417 n. 3; *Clark*, 798 F.2d at 744. Part of that control permits the district judges to employ district personnel to perform the duties of a probation officer in enforcing the conditions of community supervision. *See* Tex. Gov't Code Ann. § 76.002; Op. Tex. Att'y Gen. No. JC–0314 (2000); *see also Clark*, 798 F.2d at 744 (citing Op. Tex. Att'y Gen. No. JM–410).

In the case at bar, Morgan, in his affidavit, confirms that he "was appointed Chief Probation Officer by the District Judges trying criminal cases for Jefferson County." Morgan states:

> As Chief Probation Officer or Director as I am now referred to, I manage the staff of the Jefferson County Community Supervision and Corrections Department (JCCSCD). I, myself, and the staff of the Jefferson County CSCD, are paid by funds deposited in a special account for Jefferson County, as prescribed by law, which are under the authority of the District Judges trying criminal cases.

Attached to his affidavit is Morgan's appointment as Director of the Community Supervision and Corrections Department for Jefferson County, Texas, signed by the state district judges of Jefferson County, Texas. In addition, Morgan provides a copy of his request to approve Yowman for employment as a probation officer, which was approved and signed by the state district judges. Morgan states that, as director, his duties include the "recruitment, hiring, training, discipline and termination

---

**1.** Other relevant factors include: "(1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the 'employer' or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; *i.e.*, by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the 'employer;' (9) whether the worker accumulates retirement benefits; (10) whether the 'employer' pays social security taxes; and (11) the intention of the parties." *Broussard v. Bossier, Inc.*, 789 F.2d 1158, 1160 (5th Cir.1986) (quoting *Spirides v. Reinhardt*, 613 F.2d 826, 832 (D.C.Cir.1979)).

of personnel at JCCSCD on behalf of the judges who appointed me." Morgan also includes the preface to the county personnel manual, which he authored after Adult Probation became JCCSCD, which states that "[a]ll employees serve at the will and discretion of the Director under the direction of the Administrative Board of Judges." The preface further explains that "[e]mployees of the Jefferson County Community Supervision and Corrections Department are considered to be employees of the Judicial District Community Supervision and Corrections Department, a special district, yet a governmental subdivision."

In light of the fact that, under Texas law, the district judges "participate in the management of the department, appoint the department director, and employ and pay district personnel," the court concludes that the JCCSCD staff are officers and employees of the judicial districts in which they serve. *Sullivan*, 106 S.W.3d at 189. Texas law places control of probation departments in the hands of district judges, who are elected state officials. *See PYCA Indus., Inc.*, 81 F.3d at 1417 n. 3. In *Shore*, the court explained that because the district judges are empowered to employ and dismiss individuals in the probation department, any actions by the director "would be as an agent for the Judges." 414 F.Supp. at 385; *see Sullivan*, 106 S.W.3d at 189. The *Shore* court further explained that "any equitable relief granted must therefore be directed against the 'Judges ....'" 414 F.Supp. at 385; *see Sullivan*, 106 S.W.3d at 189 (citing *Clark v. Tarrant County*, 608 F.Supp. 209, 211 (N.D.Tex.1985), *rev'd in part on other grounds*, 798 F.2d at 739 (5th Cir.1986) (holding that probation department employees are not county employees)).

Because ultimate control over JCCSCD staff lies with the district judges, JCCSCD does not satisfy the control component of the hybrid economic realities/common law

control test to constitute Yowman's employer. *See Sullivan*, 106 S.W.3d at 190; *see also O'Reilly v. Montgomery County*, No. 102CV1242–DFH, 2003 WL 23101795, at *4 (S.D.Ind. Feb.24, 2003). Moreover, JCCSCD does not fulfill the economic realities portion of the test, as the district judges oversee the special account from which JCCSCD staff are paid. Thus, as JCCSCD is not Yowman's employer, her claims of racial and gender discrimination brought against it under Title VII are jurisdictionally deficient and provide no basis for relief.

## III. *Conclusion*

In summary, JCCSCD's motion to dismiss with respect to the timeliness of Yowman's amended complaint, adding JCCSCD as a defendant, is denied. In these circumstances, under the doctrine of equitable tolling and Rule 15(c), Yowman's amended complaint relates back to her original complaint. Yowman, however, has not adduced sufficient evidence to defeat JCCSCD's motion for summary judgment. In addition to not filing a timely response, Yowman has set forth no outstanding issues of material fact, as JCCSCD is a state instrumentality that has Eleventh Amendment immunity from Yowman's claims brought under 42 U.S.C. §§ 1981 and 1981a and the ADEA. Furthermore, because JCCSCD is not Yowman's employer, her Title VII claims are without jurisdictional foundation. Accordingly, JCCSCD's Motion for Summary Judgment is granted. Yowman has failed to present a claim that would entitle her to relief, and JCCSCD is entitled to judgment as a matter of law.

IT IS SO ORDERED.